2006 UT 31

STATE of Utah, Plaintiff and Appellee,

v.

**Rodney Hans HOLM, Defendant and Appellant.**

No. 20030847.

Supreme Court of Utah.

May 16, 2006.

---

54. *State v. Heaton,* 958 P.2d 911, 918 (Utah 1998).

**730**

Mark L. Shurtleff, Att'y Gen., Paul F. Graf, Kristine Knowlton, Laura B. Dupaix, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

Max D. Wheeler, Rodney R. Parker, Salt Lake City, for defendant.

DURRANT, Justice:

¶ 1 In this case, we are asked to determine whether Rodney Hans Holm was appropriately convicted for bigamy and unlawful sexual conduct with a minor. Specifically, we are asked to determine whether Holm's behavior violated Utah's bigamy statute and whether that statute is constitutional. We are also asked to decide whether the trial court adequately established its criminal jurisdiction over the unlawful sexual conduct charges and whether the unlawful sexual conduct statute is unconstitutional on equal protection grounds. We conclude that Holm's behavior falls squarely within the realm of behavior criminalized by our State's bigamy statute and that the protections enshrined in the federal constitution, as well as our state constitution, guaranteeing the free exercise of religion and conscience, due process, and freedom of association do not shield Holm's polygamous practices from state prosecution. We further conclude that the trial court appropriately exercised jurisdiction over Holm's unlawful sexual conduct charges and that the unlawful sexual conduct statute is constitutional. Accordingly, we affirm the defendant's conviction under Utah Code section 76–7–101 for bigamy and under Utah Code section 76–5–401.2 for unlawful sexual conduct with a minor.

## BACKGROUND

¶ 2 Holm was legally married to Suzie Stubbs in 1986. Subsequent to this marriage, Holm, a member of the Fundamentalist Church of Jesus Christ of Latter-day Saints (the "FLDS Church"),[1] participated in a religious marriage ceremony with Wendy Holm. Then, when Rodney Holm was thirty-two, he participated in another religious marriage ceremony with then-sixteen-year-old Ruth Stubbs, Suzie Stubbs's sister. After the ceremony, Ruth moved into Holm's house, where her sister Suzie Stubbs, Wendy Holm, and their children also resided. By the time Ruth turned eighteen, she had conceived two children with Holm, the second of which was born approximately three months after her eighteenth birthday.

---

1. The FLDS Church is one of a number of small religious communities in Utah that continue to interpret the early doctrine of the Church of Jesus Christ of Latter-day Saints (the "LDS Church" or "Mormon Church") as supporting the practice of "plural marriage," or polygamy. Though often referred to as "fundamentalist Mormons," these groups have no connection to the LDS Church, which renounced the practice of polygamy in 1890.

¶ 3 Holm was subsequently arrested in Utah and charged with three counts of unlawful sexual conduct with a sixteen- or seventeen-year-old,[2] in violation of Utah Code section 76–5–401.2 (2003),[3] and one count of bigamy, in violation of Utah Code section 76–7–101 (2003)[4]—all third degree felonies. The trial court denied both Holm's pretrial motion for a continuance to prepare a defense based on *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), which was issued a little over a month before trial, and Holm's motion to dismiss based on statutory grounds and the constitutional invalidity of the bigamy and unlawful sexual conduct statutes.

¶ 4 At trial, Ruth Stubbs testified that although she knew that the marriage was not a legal civil marriage under the law, she believed that she was married. Stubbs's testimony included a description of the ceremony she had participated in with Holm. Stubbs testified that, at the ceremony, she had answered "I do" to the following question:

Do you, Sister [Stubbs], take Brother [Holm] by the right hand, and give yourself to him to be his lawful and wedded wife for time and all eternity, with a covenant and promise on your part, that you will fulfil all the laws, rites and ordinances pertaining to this holy bond of matrimony in the new and everlasting covenant, doing this in the presence of God, angels, and these witnesses, of your own free will and choice?

Stubbs testified that she had worn a white dress, which she considered a wedding dress; that she and Holm exchanged vows; that Warren Jeffs, a religious leader in the FLDS religion, conducted the ceremony; that other church members and members of Holm's family attended the ceremony; and that photographs were taken of Holm, Stubbs, and their guests who attended the ceremony.

¶ 5 Stubbs also testified about her relationship with Holm after the ceremony. She testified that she had moved in with Holm; that Holm had provided, at least in part, for Stubbs and their children; and that she and Holm had "regularly" engaged in sexual intercourse at the house in Hildale, Utah. Evidence was also introduced at trial that Holm and Stubbs "regarded each other as husband and wife."

¶ 6 At the close of the State's case in chief, Holm moved for reconsideration of his motion to dismiss, arguing that the jury should not be allowed to consider whether he violated the bigamy statute by purporting to marry Stubbs. Specifically, he argued that the "purporting to marry" prong of the bigamy statute applied only to legally recognized marriages. The court again rejected his motion.

¶ 7 During the course of the trial, the court denied Holm's request to present rebuttal evidence in the form of expert testimony concerning FLDS practice and beliefs. This evidence would have included Kenneth D. Driggs's testimony about the deeply held religious belief among FLDS adherents that this type of marriage is "necessary to their personal salvation," the history of polygamy, and the social health of polygamous communities.

¶ 8 The jury returned a guilty verdict on each of the charges, indicating on a special verdict form that Holm was guilty of bigamy both because he "purported to marry Ruth

---

2. The three unlawful sexual conduct with a minor charges were based on the fact that Ruth Stubbs had conceived two children with Holm before she turned eighteen and on the allegation that sexual conduct occurred between Ruth Stubbs and Holm the night after the religious marriage ceremony. At a preliminary hearing, the magistrate dismissed the third unlawful sexual conduct charge because there was insufficient evidence to find that any sexual conduct occurred the night after the marriage ceremony.

3. Utah Code section 76–5–401.2 provides, in pertinent part, as follows:

A person commits unlawful sexual conduct with a minor if, under circumstances not amounting to [other, more serious sexual offenses], the actor who is ten or more years older than the minor at the time of the sexual conduct ... has sexual intercourse with a minor....

4. Utah Code section 76–7–101 provides, in pertinent part, as follows:

A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person or cohabits with another person.

Stubbs" and because he had "cohabited with Ruth Stubbs." The trial court sentenced Holm to up to five years in state prison on each conviction, to be served concurrently, and imposed a $3,000 fine. Both the prison time and the fine were suspended in exchange for three years on probation, one year in the county jail with work release, and two hundred hours of community service.

¶ 9 Holm appealed his conviction on all charges. The Utah Court of Appeals, sua sponte, certified the appeal for transfer to this court pursuant to rule 43 of the Utah Rules of Appellate Procedure. This court has jurisdiction pursuant to Utah Code section 78–2–2(3)(b) (2002).

### STANDARD OF REVIEW

¶ 10 On appeal, Holm raises several issues requiring us to engage in statutory and constitutional interpretation, to examine whether the trial court had jurisdiction, and to determine whether the trial court properly excluded expert testimony. Except for the exclusion of evidence issue, each of these issues involves questions of law, which we review for correctness. *See State v. Green*, 2004 UT 76, ¶ 42, 99 P.3d 820 (constitutional challenges to statutes); *State v. MacGuire*, 2004 UT 4, ¶ 8, 84 P.3d 1171 (statutory interpretation); *State v. Payne*, 892 P.2d 1032, 1033 (Utah 1995) (trial court jurisdiction). As to the evidence issue, we review a trial court's decision to exclude expert testimony for an abuse of discretion. *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794.

### ANALYSIS

¶ 11 On appeal Holm raises arguments against both his conviction for bigamy and his conviction for unlawful sexual conduct with a minor. We discuss Holm's arguments for reversing each of his convictions separately below.

### I. WE AFFIRM HOLM'S CONVICTION FOR BIGAMY

¶ 12 Holm was convicted pursuant to Utah's bigamy statute, which provides that "[a] person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person or cohabits with another person." Utah Code Ann. § 76–7–101 (2003). The jury weighing the case against Holm indicated on a special verdict form its conclusion that Holm had both "purported to marry another person" and "cohabited with another person" knowing that he already had a wife.

¶ 13 Due to the nature of the special verdict form, on appeal Holm must convince this court that both prongs of Utah's bigamy statute have been inappropriately applied in his case. Holm raises essentially four arguments to support his contention that neither prong applies. First, Holm argues that his conviction under the "purports to marry" prong of the bigamy statute was improper as a matter of statutory interpretation. Specifically, Holm argues that he did not "purport to marry" Ruth Stubbs, as that phrase is used in the bigamy statute, because the word "marry" in subsection 76–7–101(1) refers only to legal marriage and neither Holm nor Stubbs contemplated that the religious ceremony solemnizing their relationship would entitle them to any of the legal benefits attendant to state-sanctioned matrimony. Second, Holm argues that his conviction under the bigamy statute was unconstitutional as applied in this case because it unduly infringes upon his right to practice his religion, as guaranteed by our state constitution. Third, Holm argues that his conviction under the bigamy statute was unconstitutional under the federal constitution. Fourth, Holm argues that the trial court improperly excluded expert testimony that was offered to rebut the State's characterization of polygamous culture.

¶ 14 We reject each of these arguments. The "purports to marry" language contained in the bigamy statute is not confined to legal marriage and is, in fact, broad enough to cover the type of religious solemnization engaged in by Holm and Stubbs. We further conclude that the ability to engage in polygamous behavior is expressly excepted from the religious protections afforded by our state constitution. We are also unpersuaded that the federal constitution mandates that the states of this union tolerate polygamous

behavior in the name of substantive due process or freedom of association. Additionally, in the face of controlling United States Supreme Court authority, we are constrained to conclude that the federal constitution does not protect Holm from bigamy prosecution on religious freedom grounds. Finally, we conclude that the trial court did not abuse its discretion by excluding Holm's proffered expert testimony because the testimony was not directly related to the questions before the jury and may have confused or distracted the jury.

¶ 15 We will first address whether Holm's behavior is within the reach of our State's bigamy statute. We will then address Holm's arguments attacking the validity of the bigamy statute on both state and federal constitutional grounds. Finally, we will address Holm's arguments regarding the trial court's exclusion of his proffered expert testimony.

A. The "Purports to Marry" Provision of Utah's Bigamy Statute Is Applicable to Holm's Solemnization of His Relationship with Stubbs

¶ 16 To determine whether the "purports to marry" provision of Utah's bigamy statute is properly applicable to Holm, we must interpret that provision within its context in the Utah Code. "[O]ur primary goal in interpreting statutes is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve." *Foutz v. City of S. Jordan,* 2004 UT 75, ¶ 11, 100 P.3d 1171 (internal quotation marks omitted). "We presume that the legislature used each word advisedly and give effect to each term according to its ordinary and accepted meaning." *C.T. v. Johnson,* 1999 UT 35, ¶ 9, 977 P.2d 479 (internal quotation marks omitted). Furthermore, "[w]e read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Miller v. Weaver,* 2003 UT 12, ¶ 17, 66 P.3d 592. Only when we find that a statute is ambiguous do we look to other interpretive

tools such as legislative history. *See Adams v. Swensen,* 2005 UT 8, ¶ 8, 108 P.3d 725.

¶ 17 The "purports to marry" provision of Utah's bigamy statute declares that "[a] person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person." Utah Code Ann. § 76–7–101(1). Both parties to this appeal agree that "purport" means "[t]o profess or claim falsely; to seem to be." *Black's Law Dictionary* 1250 (7th ed.1999).

¶ 18 The definition of "marry," however, is disputed. The State argues that "marry" should not be construed as limited to legally recognized marriages. Holm argues that the word "marry" in subsection one refers only to a legally recognized marriage and that, therefore, there is no violation of the "purports to marry" provision unless an individual purports to enter into a legally valid marriage. We hold that the term "marry," as used in the bigamy statute, includes both legally recognized marriages and those that are not state-sanctioned because such a definition is supported by the plain meaning of the term, the language of the bigamy statute and the Utah Code, and the legislative history and purpose of the bigamy statute.

¶ 19 First, the common usage of "marriage" supports a broader definition of that term than that asserted by Holm. The dictionary defines "marry" as "to join in marriage according to law *or* custom," or "to unite in close and [usually] permanent relation." *Merriam–Webster's Collegiate Dictionary* 761 (11th ed.2003) (emphasis added). Holm argues that such a definition of "marriage" is unsupportable and asks us to read the term "legally" into the bigamy statute. To support his argument that "marry" should be construed narrowly in this fashion, Holm relies on *Black's Law Dictionary,* which defines "marriage" as "[t]he legal union of a man and woman as husband and wife." *Black's Law Dictionary* 986. While *Black's Law Dictionary* does offer this as one definition of marriage, a review of the dictionary's various entries and editions[5] makes clear

5. We note that there are discrepancies between

the definitions provided for "marriage" and "po-

that the dictionary itself does not confine its use of the term "marriage" to legally recognized unions. Indeed, the definitions *Black's Law Dictionary* provides for terms such as "plural marriage," "bigamy," and "polygamy" support a construction of the term "marry" that includes marriage not sanctioned by the state, as is true in common parlance. For example, "plural marriage" is defined as "[a] *marriage* in which one spouse is already married to someone else; a bigamous or polygamous union," *id.* at 987 (emphasis added); "bigamy" is defined as "[t]he act of *marrying* one person while legally married to another," *id.* at 154 (emphasis added); and "polygamy" is "[t]he state of being simultaneously *married* to more than one spouse; multiple marriages," *id.* at 1180 (emphasis added). If we were to adopt Holm's construction of "marry," these definitions would be nonsensical, as one could not "marry" another while legally married.

¶ 20 Furthermore, *Black's Law Dictionary* contains several definitions of different types of marriage that are, by definition, not legally recognized. For example, "putative marriage" is *"marriage* in which husband and wife believe in good faith that they are married, but for some technical reason are not formally married (as when the ceremonial official was not authorized to perform a marriage)"; "clandestine marriage" is *"marriage*

that rests merely on the agreement of the parties" or *"marriage* entered into in a secret way, as one solemnized by an unauthorized person or without all required formalities"; and "void marriage" is *"marriage* that is invalid from its inception, that cannot be made valid, and that can be terminated by either party without obtaining a divorce or annulment." *Id.* at 986–87 (emphases added).

¶ 21 Moreover, the *Black's Law Dictionary* definition of the term "marriage," unadorned by modifiers, states that "[a]lthough the common law regarded marriage as a civil contract, it is more properly the civil status or relationship existing between a man and a woman who agree to and do live together as spouses." *Id.* at 986. Thus, the plain meaning of the term "marry," as it is used in the bigamy statute, supports our conclusion that it encompasses both marriages that are legally recognized and those that are not.

¶ 22 Second, when we look, as we must, at the term "marry" in the context of the bigamy statute, as well as statutes in the same chapter and related chapters of the Utah Code, it is clear that the Legislature intended "marry" to be construed to include marriages that are not state-sanctioned. Most significantly, the text of the bigamy statute supports a more expansive definition of "bigamy" than that asserted by Holm.[6] Specifi-

---

lygamy" in the seventh and eighth editions of *Black's Law Dictionary.* In the seventh edition "marriage" is defined as "[t]he legal union of a man and woman as husband and wife," whereas in the eighth edition it is defined as "[t]he legal union of a couple as husband and wife." *Compare Black's Law Dictionary* 986 (7th ed.1999), *with Black's Law Dictionary* 986 (8th ed.2004). Also, included within the definition of "marriage" contained in the seventh edition is the statement that "[a]lthough the common law regarded marriage as a civil contract, it is more properly the civil status or relationship existing between a man and a woman who agree to and do live together as spouses." Such a statement is absent from the eighth edition. *See Black's Law Dictionary* 992 (8th ed.2004). "Polygamy" is defined in the seventh edition as "[t]he state of being simultaneously married to more than one spouse; multiple marriages" and in the eighth edition as "[t]he state or practice of having more than one spouse simultaneously, multiple marriages." *Compare Black's Law Dictionary* 1180 (7th ed.1999) *with Black's Law Dictionary* 1197 (8th ed.2004). For purposes of this opinion, all

references to *Black's Law Dictionary* are to the seventh edition unless otherwise noted.

**6.** The dictionary definition of "bigamy" implies that at least one legally recognized marriage exists. *See Black's Law Dictionary* 154 (7th ed.1999) (defining "bigamy" as "[t]he act of marrying one person while legally married to another"). As discussed above, however, this definition itself illustrates that the general conception of the term "marriage" is not confined to legally recognized marriage. Beyond dictionary definitions, it is evident that when the Territory of Utah enacted a law criminalizing polygamy, the term "marry" was not confined to legally recognized marriage. *See* 1892 Utah Laws, ch. VII, § 1, at 5–6 ("Every person who has a husband or wife living, who, hereafter *marries* another ... is guilty of polygamy." (emphasis added)). As with the definition of bigamy found in *Black's Law Dictionary,* the territorial law criminalizing polygamy would be nonsensical if the term "marry" is considered limited to legally recognized marriage.

cally, the bigamy statute does not require a party to enter into a second marriage (however defined) to run afoul of the statute; cohabitation alone would constitute bigamy pursuant to the statute's terms. *See* Utah Code Ann. § 76–7–101(1) ("A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person ... cohabits with another person.").

¶ 23 Also, looking at related statutes in the Utah Code, it is clear that the Legislature did not intend to limit "marriage," as it is used throughout the Utah Code, to legally recognized marriages. By expressly recognizing unsolemnized marriages and allowing for a judicial determination to establish a legal marriage at some point prior to the request for a judicial decree, the Legislature has acknowledged that the attainment of a marriage license from the State is not determinative of whether a marriage exists. *See* Utah Code Ann. § 30–1–4.5 (Supp.2004); *Whyte v. Blair*, 885 P.2d 791, 793 (Utah 1994) ("[The judicial decree] merely recognizes that a woman and a man have by their prior consent and conduct entered into a marital relationship, although it was not theretofore formally solemnized or otherwise legally recognized."). In other words, the Utah Code contemplates that there will be "marital relationships" or "marriages" that are not legally recognized from inception, but which the State has the ability to legally recognize, even if the parties to that relationship do not desire such recognition. *See* *State v. Green*, 2004 UT 76, ¶¶ 3–59, 99 P.3d 820 (rejecting a convicted polygamist's argument that the State was foreclosed from establishing a legally recognized marriage pursuant to the unsolemnized marriage statute to support its bigamy prosecution). The Utah Code also recognizes that a marriage may be solemnized even though the marriage is illegal. Utah Code Ann. § 30–1–15 (1998) (penalizing anyone who "knowingly ... solemnizes a *marriage* ... prohibited by law" (emphasis added)).

¶ 24 Holm contends that the term "marry" should be given the same breadth of meaning wherever it appears in the Utah Code. Accordingly, Holm argues that the term "marry" must be limited to legally recognized marriages because, if a broader definition is applied here, we would have to construe "marry" to encompass informal solemnizations in other sections of the bigamy statute specifically and the Utah Code generally. Holm bases this argument on subsection three of the bigamy statute, which essentially creates a mistake-of-fact defense for a bigamy defendant. Subsection three provides that "[i]t shall be a defense to bigamy that the accused reasonably believed he and the other person were legally eligible to remarry." Utah Code Ann. § 76–7–101(3). Holm argues that the term "remarry" in subsection three clearly refers to a legal marriage and that the term "marry" in subsection one should carry the same meaning. *See Spring Canyon Coal Co. v. Indus. Comm'n of Utah*, 74 Utah 103, 277 P. 206, 206–11 (1929) ("The same meaning will be given to a word or phrase used in different parts of a statute.").

¶ 25 We are not persuaded that the term "remarry," as used in subsection three, is so clearly limited to legally recognized marriage. Consequently, we are not convinced that a broader interpretation of "marry" as used in subsection one is inconsistent with other uses of that term in the bigamy statute. Rather, in the absence of language limiting the definition of the term, it is appropriate to give the term chosen by the Legislature its full force, applying it to marriages recognized both by law and by custom. Conceived in this fashion, the defense offered by subsection three merely excuses bigamous marriages commenced with a *reasonable* belief that initiating the marital relationship would not run afoul of this State's bigamy law.

¶ 26 Third, although we need not look at other interpretive tools when the meaning of the statute is plain, our construction of "marry" is supported by the legislative history and purpose of the bigamy statute. As will be discussed more fully below, *see infra* ¶¶ 40–48, the well-documented legislative history of this State's attempts to prevent the formation of polygamous unions supports our conclusion that the bigamy statute was intended to criminalize both attempts to gain

legal recognition of duplicative marital relationships and attempts to form duplicative marital relationships that are not legally recognized. This court has previously recognized that the legislative purpose of the bigamy statute was to prevent "all the indicia of marriage repeated more than once." *Green*, 2004 UT 76, ¶ 47, 99 P.3d 820. In *Green*, we allowed an unsolemnized marriage to serve as a predicate marriage for purposes of a bigamy prosecution. *See id.* ¶ 8. If an unlicensed, unsolemnized union can serve as the predicate marriage for a bigamy prosecution, we are constrained to conclude that an unlicensed, solemnized marriage can serve as a subsequent marriage that violates the bigamy statute.

¶ 27 The dissent nevertheless adopts Holm's position that "purports to marry" means "purports to legally marry," "claims to enter a legally recognized marriage," or "claims benefits from the State based upon married status." In addition to the reasons proffered by Holm, the dissent seeks to support its reading of the statute by referring to our case law, which at times has used the term "purported marriage" to refer to a marriage that is presented as legally valid and recognized, when in reality the marriage enjoys no legal recognition. *See infra* ¶ 138 n. 4 (citing cases). These cases do not, however, delineate the scope of the term "purports to marry" as the term is used in the bigamy statute, but instead involve situations in which the proper resolutions of various claims are dependent in some fashion on the existence, or absence, of a legally recognized marriage. It is true that, in assessing such claims, we have referred to the claim that a valid, legally recognized marriage exists as a claim of a "purported marriage." It does not, however, necessarily follow that the phrase "purports to marry," as used in the bigamy statute, is similarly confined to claims that a legally valid and recognized marriage has been performed. Simply because one may also purport to enter into a legally recognized marriage does not foreclose the possibility that one may purport to marry without claiming any legal recognition of the marital relationship.

¶ 28 In sum, we are not convinced that the plain language of the statute, which fails to adorn the term "marry" with any limiting modifiers, justifies the inference drawn by the dissent, and we decline to import such a substantive term into the language of the statute. *See Arredondo v. Avis Rent A Car Sys., Inc.*, 2001 UT 29, ¶ 12, 24 P.3d 928 (stating that this court will not "infer substantive terms into the [statutory] text that are not already there" (internal quotation marks omitted)). Accordingly, we read the plain language of our bigamy statute as prohibiting an individual from claiming to marry a person when already married to another. Further, we conclude that the term "marry" is not confined to legally recognized marriages. In other words, one need not purport that a second marriage is entitled to legal recognition to run afoul of the "purports to marry" prong of the bigamy statute. Nowhere in subsection one is the word "marry" tied exclusively to state-sanctioned and recognized "legal" marriage.

¶ 29 Applying the definition of "marry" outlined above to the facts presented in this case, there can be no doubt that Holm purported to marry Stubbs. The undisputed facts establish that Holm stood before an official of the FLDS Church, Warren Jeffs (son of then-FLDS prophet Rulon Jeffs), with Stubbs at his side and responded affirmatively to a vow asking the following question:

Do you Brother [Holm], take Sister [Stubbs] by the right hand, and receive her unto yourself to be your lawful and wedded wife, and you to be her lawful and wedded husband, for time and all eternity, with a covenant and promise, on your part that you will fulfil all the laws, rites and ordinances pertaining to this holy bond of matrimony in the new and everlasting covenant, doing this in the presence of God, angels, and these witnesses, of your own free will and choice?

¶ 30 At the ceremony, Stubbs wore a white dress, which she considered a wedding dress. Throughout her testimony at the trial court, Stubbs referred to the ceremony as a marriage. As mentioned, the ceremony was officiated by a religious leader and involved

vows typical of a traditional marriage ceremony. *See* Utah Code Ann. § 30–1–6(1) (Supp.2004) (stating that religious officials who are older than eighteen and "in regular communion with any religious society" are empowered to solemnize a marriage). In short, the ceremony in which Holm and Stubbs participated appeared, in every material respect, indistinguishable from a marriage ceremony to which this State grants legal recognition on a daily basis.

¶ 31 At trial, Stubbs testified that following the ceremony she considered herself married. The facts show that Stubbs lived in a house with Holm, that Holm and Stubbs considered themselves husband and wife, and that Holm and Stubbs regularly engaged in sexual intercourse. Although no one of these factors is itself indicative of marriage, looking at the cumulative effect of the factors present in this case it is clear that the relationship formed by Holm and Stubbs was a marriage, as that term is used in the bigamy statute.

¶ 32 In rejecting the notion that Holm violated the "purports to marry" provision of the bigamy statute, the dissent assigns central importance, in fact almost exclusive importance, to the lack of a marriage license recognizing the marital commitments made by Holm and Stubbs. But while a marriage license represents a contract between the State and the individuals entering into matrimony, the license itself is typically of secondary importance to the participants in a wedding ceremony. The crux of marriage in our society, perhaps especially a religious marriage, is not so much the license as the solemnization, viewed in its broadest terms as the steps, whether ritualistic or not, by which two individuals commit themselves to undertake a marital relationship. Certainly Holm, as a result of his ceremony with Stubbs, would not be entitled to any legal benefits attendant to a state-sanctioned marriage, but there is no language in the bigamy statute that implies that the presence of or

desire for such benefits should be determinative of whether bigamy has been committed. Holm, by responding in the affirmative to the question placed to him by his religious leader, committed himself to undertake all the obligations of a marital relationship. The fact that the State of Utah was not invited to register or record that commitment does not change the reality that Holm and Stubbs formed a marital bond and commenced a marital relationship. The presence or absence of a state license does not alter that bond or the gravity of the commitments made by Holm and Stubbs.

¶ 33 Accordingly, we hold that Holm's behavior is within the ambit of our bigamy statute's "purports to marry" prong.[7] Having so concluded, we now turn to Holm's arguments attacking the constitutional legitimacy of his bigamy conviction. Because this court has endorsed the primacy approach to constitutional challenges, whereby we first attempt to resolve constitutional challenges by appealing to our state constitution before turning to the federal constitution, we first analyze whether Holm's conduct is protected pursuant to the Utah Constitution. *See West v. Thomson Newspapers*, 872 P.2d 999, 1006 (Utah 1994) (outlining the rationale for adopting the primacy model). After addressing Holm's state constitutional claims, we will turn to Holm's contention that the bigamy statute offends the federal constitution.

### B. The Utah Constitution Does Not Shield Holm's Polygamous Behavior from State Prosecution

¶ 34 It is ironic indeed that Holm comes before this court arguing that the Utah Constitution, despite its express prohibition of polygamous marriage, actually provides greater protection to polygamous behavior than the federal constitution, which contains no such express prohibition. In making this argument, Holm relies on various provisions of our state constitution that protect the

---

7. Because we conclude that Holm's behavior violates the "purports to marry" prong of the bigamy statute, we need not reach Holm's arguments relating to the validity of the cohabitation prong. As indicated above, the jury convicted Holm under both prongs of the bigamy statute, and if, as

we conclude, Holm was properly convicted pursuant to the "purports to marry" prong of the bigamy statute, it is of no consequence whether the cohabitation prong was properly applied to him.

freedom of conscience and the exercise of religion, as well as provisions securing liberty interests for the people of this State. While our state constitution may well provide greater protection for the free exercise of religion in some respects than the federal constitution,[8] we disagree that it does so as to polygamy.

¶ 35 This court has "never determined whether the free exercise clause of article I, section 4 [and related clauses] of the Utah Constitution provide[ ] protection over and above that provided by the First Amendment to the United States Constitution." *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998).

■ ¶ 36 As in *Jeffs*, we need not address that question here because the Utah Constitution offers no protection to polygamous behavior and, in fact, shows antipathy towards it by expressly prohibiting such behavior. Specifically, article III, section 1, entitled "Religious toleration—Polygamy forbidden," states as follows: "First:—Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited." Utah Const. art. III, § 1. This language, known commonly as the "irrevocable ordinance," unambiguously removes polygamy from the realm of protected free exercise of religion. In fact, we concluded as much in *In re Black*, 3 Utah 2d 315, 283 P.2d 887, 905 (1955). In that case, the State was attempting to remove children from the custody and care of polygamous parents. *Id.* at 888. The parents argued that the judgment removing their children violated the constitutional guarantees contained in the Utah Constitution. *Id.* at 900. We responded that

> Article III of our Constitution is a complete answer to [the parents'] contention. The specific prohibition against polygamous or plural marriage therein contained may not be impliedly annulled by any interpretation of Sections 1, 4 and 15 of

Article I inconsistent therewith. The prohibition following as it does the guarantee of religious toleration prevents any conclusion that the framers of our Constitution did not intend to put a specified limitation on the language contained in Section 4, Article I of the State Constitution.

> *The prohibition against polygamous or plural marriages following the guarantee of religious tolerance is double emphasis that the framers of our Constitution wished to make clear that polygamy was not included within an approved mode of religious worship.*

*Id.* at 905 (emphasis added).

¶ 37 The dissent dismisses *In re Black* as a plurality opinion, dicta, and incorrect. *Infra* ¶ 151 n. 12. We do not believe that *In re Black* can be so easily dismissed. It appears that at least three of the four justices participating in that case agreed with the analysis of the effect of article III. We confirm that analysis today.

■ ¶ 38 In arguing that the irrevocable ordinance does not provide a constitutional basis for criminalizing polygamous marriages, Holm again argues that the term "marriage" is confined to legally recognized marriages. In analyzing the effect of the irrevocable ordinance, Holm once again makes an inferential leap that colors its interpretation. Just as Holm argues that the "purports to marry" prong of our bigamy statute limits its operation to a purported legally recognized marriage, so Holm argues that the irrevocable ordinance is merely an acknowledgment that the State of Utah is foreclosed from giving formal legal recognition to polygamous marriages.

¶ 39 The dissent agrees with Holm and further supports the argument that the irrevocable ordinance was intended to prohibit only legal recognition of polygamous marriages by contending that article I, section 29 of the Utah Constitution and its statutory counterpart, Utah Code section 30–1–4.1(1)(a), limit the definition of marriage to

---

8. At least two justices on this court have expressed the view that, pursuant to the guarantees contained in our state constitution, religiously motivated conduct should not be burdened by the State unless that burden furthers a compelling state interest and is narrowly tailored to serve that interest. *See Green*, 2004 UT 76, ¶ 70 & n. 1, 99 P.3d 820. (Durrant, J., concurring).

"legal unions." Article I, section 29 of the Utah Constitution provides that this State "recognize[s] as marriage only the legal union of a man and a woman." By its plain language, this section of the Utah Constitution is not a definition of marriage, but instead is a limit to the types of marriages that can be legally recognized in Utah.

¶ 40 A review of the history of the irrevocable ordinance makes clear that its drafters did not intend so narrow a sphere of operation (merely prohibiting legal recognition of polygamous marriages) as that advanced by Holm and the dissent. In 1894, the United States Congress passed the Utah Enabling Act, granting the Territory of Utah the ability to convene a constitutional convention and to take steps toward obtaining statehood. Utah Enabling Act, ch. 138, 28 Stat. 107 (1894). Included within the Enabling Act was a requirement that the Utah Constitution ultimately contain an irrevocable ordinance providing, "First: That perfect toleration of religious sentiment shall be secured, and that no inhabitant of said State shall ever be molested in person or property on account of his or her mode of religious worship; *Provided,* That polygamous or plural marriages are forever prohibited." *Id.* § 3 (emphasis added).[9] A review of the constitutional debates surrounding the adoption of the language contained in the irrevocable ordinance reveals that delegates were primarily concerned with fully complying with the requirements contained in the Utah Enabling Act. *See, e.g.,* 1 Official Report of the Proceedings and Debates of the Convention Assembled at Salt Lake City on the Fourth Day of March, 1895, to Adopt a Constitution for the State of Utah 806 [hereinafter *Proceedings* ] (comment of Mr. Eichnor) ("This is compliance with the Enabling Act, and,

gentlemen, if you want our Constitution to go in the waste basket, just tamper with the requirements the Enabling Act lays down for the compact. Do not tamper with it. That is my advice.").

¶ 41 Given the framers' express intent to comply, and, indeed, their assessment of the necessity of complying with the terms of the Utah Enabling Act, their discussion at Utah's constitutional convention centered on Congress's intent in requiring Utah to include such an ordinance in its constitution. Further, the ensuing debate plainly illustrates the framers' recognition that such a requirement was aimed at accomplishing more than simply preventing the possibility of a theocratic state and that Utah was obligated to comply with the spirit, as well as the letter, of the Enabling Act. *See* 2 *Proceedings* at 1748 (comment of Mr. Varian) ("I want to remind you all that in the construction of law, civil law as well as the law of God, and religious law, that it is the letter that killeth, and the spirit giveth life.").

¶ 42 We concede that Holm puts forward one plausible interpretation of the irrevocable ordinance; namely, that the ordinance prohibits Utah's state government from legally sanctioning or recognizing polygamous marriages. We further concede that such an interpretation comports with the reality that the federal government harbored serious concerns about the possibility that the State of Utah could be ruled de facto by the LDS Church. *See generally* Sarah Barringer Gordon, *The Mormon Question* 206–08 (2002) (describing a federal attempt to disrupt the influence of the LDS Church in the Territory of Utah). Though such an interpretation is plausible when one looks to the text of the

---

9. Holm argues that Congress, by requiring the inclusion of the irrevocable ordinance, violated the "equal footing doctrine," which essentially mandates that all states be admitted into the Union on equal terms with other states. *See generally Coyle v. Smith,* 221 U.S. 559, 565, 31 S.Ct. 688, 55 L.Ed. 853 (1911); *Potter v. Murray City,* 760 F.2d 1065, 1067 (10th Cir.1985). In *Potter,* the Tenth Circuit heard and rejected an identical claim. 760 F.2d at 1068. Specifically, the Tenth Circuit concluded that

"[i]f the original ban on polygamy and plural marriage was invalid, the State's power to

incorporate such provisions in its Constitution and its laws remained. If there was an unlawful coercion in the Enabling Act, the Supreme Court of Utah observed some time ago that there has been no attempt to change the State's laws, 'nor is such attempt likely.' "

*Id.* (quoting *State v. Barlow,* 107 Utah 292, 153 P.2d 647, 654 (1944)). We find no fault in the reasoning of the *Potter* decision, and Holm has made no attempt to attack its rationale. Therefore, we conclude that Holm's equal footing claim is without merit.

ordinance alone, the notion that the ordinance only limits legal recognition of polygamous marriages collapses when the language is looked at in the context of the constitutional convention and in conjunction with the delegates' decision to look beyond the text to the spirit of the Utah Enabling Act. At the convention, the delegates took affirmative steps to prevent an interpretation like that advanced by the dissent from gaining traction. Specifically, the framers of our state constitution made it clear they understood that the Utah Enabling Act did not merely prevent legal recognition of polygamy but required its prohibition.

¶ 43 The framers did this by expressly pronouncing in the Utah Constitution itself the continuing vitality of a territorial law passed in 1892, entitled "An Act to punish polygamy and other kindred offenses," insofar as that act defined and punished polygamy. Utah Const. art. XXIV, § 2. The framers thereby raised the status of the territorial law to that of a constitutional provision. The constitutional debates reveal that proponents of expressly declaring the territorial act criminalizing polygamy to be operational after statehood were primarily motivated by two concerns: (1) that revivification of the territorial law criminalizing polygamy was necessary because it was void at the time of its passage due to the fact that Congress had already "occupied the field" in relation to the criminalization of polygamy and (2) that compliance with the spirit of the Utah Enabling Act required the State to evidence its willingness and ability to curtail polygamous behavior.

¶ 44 As to the first concern, the delegates thought it necessary to specifically mention the law criminalizing polygamy in order to revivify that law should questions about its validity be raised. Questions about the law's validity were focused on issues of federal preemption. *See* 2 *Proceedings* at 1736 (comment of Mr. Varian) ("There was passed in 1892 by the Legislature of the Territory .... [an] act [that] defines and provides penalties for ... polygamy.... Now, that law I apprehend is not in force in Utah today, and the reason is that Congress entered upon that field ... and covered the whole subject matter."). Given concerns about the validity of the 1892 act, the delegates expressed the opinion that the wisest course of action would be to reanimate the law by expressly declaring its continuing effectiveness in the state constitution. *See id.* at 1736–37 (expressing the opinion that, to comply with the Enabling Act, the state constitution must give "the force of law" to criminal prohibitions against polygamy).

¶ 45 As to the second concern, the proposal to declare in the constitution that the territorial law criminalizing polygamy remained in effect was also viewed as necessary to comply with the spirit of the Utah Enabling Act. The sponsor of the proposal explained his intention in the following manner:

[W]hile [the ordinance] is strictly in accord with the letter of the [Utah Enabling Act], it is not in accord fully with the spirit of that act, because ... it was the intention of the people of the United States assembled in Congress that a prohibition in fact, as well as by words, should be evidenced by the organic law of this State.

2 *Proceedings* at 1736 (comment of Mr. Varian). One delegate, declaring his support for retaining the territorial law criminalizing polygamy, argued that by retaining the territorial law, Utah could fully comply with the Enabling Act and refute the notion that the ordinance amounted to nothing more than an empty promise that the State would not grant legal recognition to or otherwise sanction polygamous behavior. According to that delegate,

The moral effect of the whole State by its representatives in Convention, declaring that a certain thing shall be forever prohibited, of course has great weight, but there is a view that may be taken of that, which is this, that at most it is merely an inhibition upon the Legislature ever sanctioning an establishment of that kind, but it is not a law against it with penalties. In other words, it is without effect.

*Id.* at 1742–43 (comment of Mr. Thurman). The possibility that the ordinance might be interpreted only as a limitation preventing the State from sanctioning or legally recognizing polygamous marriages prompted the delegate to support a more affirmative ap-

proach to prohibiting polygamy. *See id.* at 1743 ("For the reason suggested, and by way of showing a more determined disposition upon our part to comply, not only in the letter, but in the spirit, with the demands of the Enabling Act, I shall support it.").

¶ 46 The framers of our state constitution viewed the reaffirmation of the 1892 territorial law criminalizing bigamy as directly related to the irrevocable ordinance. The relation between the two provisions is acknowledged throughout the debates on the issue, perhaps never as saliently as in the following statement:

> If you are in good faith, as you say you are, it will be asked, why do you object to placing upon this statute book, the organic law of your commonwealth, the fact you do intend to prevent the crime of polygamy? What does "prohibit" mean? Does it not mean prevent? I ask my friend from Salt Lake, and colleague, more learned in philological lore than myself, whether it is one of the synonyms of prevent, and if the interpretation must not be put upon the use of that language in the act of Congress, that it means to prevent the practice of polygamy and plural marriage? How are you going to prevent it, unless you put some penal enactment into force that the courts and executive officers under your State government may be able to administer your law well in that behalf?

*Id.* at 1747–48 (comment of Mr. Varian). The inclusion of the provision passed by a margin of seventy-two to sixteen. *Id.* at 1749.

¶ 47 Although the definition of polygamy contained in the 1892 territorial act varies slightly from that articulated by the "purports to marry" prong of our contemporary bigamy statute, it is clear that our state constitution is not offended by the criminal punishment of Holm's behavior. To the contrary, the framers of our state constitution understood the irrevocable ordinance to mandate the prevention of polygamy and not to merely prohibit government recognition of polygamy.

¶ 48 Given the above, we conclude that Holm is foreclosed by the language of the state constitution from making any attempt to appeal to that document—whether pursuant to the provisions pertaining to the freedom of conscience, individual liberty, or free exercise—to protect behavior that the constitution is specifically aimed at preventing. Having so concluded, we next take up Holm's contention that his polygamy conviction violates the federal constitution.

## C. Holm's Conviction Does Not Offend the Federal Constitution

¶ 49 Holm claims his conviction runs afoul of the federal constitution in several ways. Specifically, he argues (1) that his conviction was obtained in violation of the federal constitution's guarantee of the free exercise of religion; (2) that his conviction violates his liberty interest protected by the Due Process Clause of the Fourteenth Amendment; (3) that his conviction raises equal protection concerns because the State targets only religiously motivated polygamists with prosecution; (4) that the bigamy statute is facially overbroad because it unduly infringes upon his right of association; and (5) that the term "marry," as used in the bigamy statute and the unlawful sexual conduct with a minor statute, is unconstitutionally vague. We address each of Holm's contentions in turn.

### 1. The Bigamy Statute Does Not Impermissibly Infringe Holm's Federal Free Exercise Right

¶ 50 Although the United States Supreme Court, in *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879), upheld the criminal prosecution of a religiously motivated polygamist as nonviolative of the Free Exercise Clause, Holm contends on appeal that his federal free exercise right is unduly infringed upon by his conviction in this case. Holm argues that *Reynolds* is "nothing more than a hollow relic of bygone days of fear, prejudice, and Victorian morality," and that modern free exercise jurisprudence dictates that no criminal penalty can be imposed for engaging in religiously motivated polygamy. This court recently rejected an identical argument in *State v. Green,* 2004 UT 76, ¶¶ 18–19, 99 P.3d 820.

¶ 51 As we pointed out in *Green*, *Reynolds*, despite its age, has never been overruled by the United States Supreme Court and, in fact, has been cited by the Court with approval in several modern free exercise cases, signaling its continuing vitality. *See Green*, 2004 UT 76, ¶ 19, 99 P.3d 820 (refusing to depart from the *Reynolds* holding and citing cases indicating the continuing vitality of *Reynolds* as precedent). Moreover, even if Holm's assertion that *Reynolds* is antiquated beyond usefulness is accurate, our opinion in *Green* conducted a thorough analysis, using the most recent standards announced by the United States Supreme Court, of the claim that religiously motivated polygamy is immune from criminal sanction. *Id.* ¶¶ 20–41. As we noted in *Green*, the United States Supreme Court held in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), *partially superseded by statute*, Religious Freedom Restoration Act of 1993, 107 Stat. 1488, *as recognized in Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, —— U.S. ——, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006), *and* Religious Land Use and Institutionalized Persons Act of 2000, 114 Stat. 804, *as recognized in Cutter v. Wilkinson*, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), that a state may, even without furthering a compelling state interest, burden an individual's right to free exercise so long as the burden is imposed by a neutral law of general applicability. *Id.* at 878–80, 110 S.Ct. 1595. The Court has since clarified that a law is not neutral if the intent of that law "is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In *Green*, we concluded that Utah's bigamy statute is a neutral law of general applicability and that any infringement upon the free exercise of religion occasioned by that law's application is constitutionally permissible. 2004 UT 76, ¶ 33, 99 P.3d 820.

¶ 52 Regardless of the wisdom of the United States Supreme Court's current federal free exercise analysis, that analysis is con-

trolling, and this court does not enjoy the freedom to tamper with or modify pronouncements by that Court. In light of those pronouncements and our own case law rejecting the notion that religiously motivated polygamy is protected by the federal Free Exercise Clause, we conclude that Holm cannot avail himself of that clause in his attempt to escape conviction. Having so concluded, we turn to Holm's claim that his conviction violates his individual liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

## 2. Holm's Conviction Does Not Offend the Due Process Clause of the Fourteenth Amendment

¶ 53 Holm argues that the State of Utah is foreclosed from criminalizing polygamous behavior because the freedom to engage in such behavior is a fundamental liberty interest that can be infringed only for compelling reasons and that the State has failed to identify a sufficiently compelling justification for its criminalization of polygamy. We disagree and conclude that there is no fundamental liberty interest to engage in the type of polygamous behavior at issue in this case.

¶ 54 In arguing that his behavior is constitutionally protected as a fundamental liberty interest, Holm relies primarily on the United States Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). In that case, the United States Supreme Court struck down a Texas statute criminalizing homosexual sodomy, concluding that private, consensual sexual behavior is protected by the Due Process Clause of the Fourteenth Amendment. *See id.* at 578, 123 S.Ct. 2472. Holm argues that the liberty interest discussed in *Lawrence* is sufficiently broad to shield the type of behavior that he engages in from the intruding hand of the state. Holm misconstrues the breadth of the *Lawrence* opinion.

¶ 55 Despite its use of seemingly sweeping language, the holding in *Lawrence* is actually quite narrow.[10] Specifically, the Court takes

---

**10.** In fact, numerous litigants have relied upon the *Lawrence* decision to attempt to expand the

sphere of behavior protected by the federal constitution. Given the quite limited nature of that

pains to limit the opinion's reach to decriminalizing private and intimate acts engaged in by consenting adult gays and lesbians. In fact, the Court went out of its way to exclude from protection conduct that causes "injury to a person or abuse of an institution the law protects." *Id.* at 567, 123 S.Ct. 2472. Further, after announcing its holding, the Court noted the following: "The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct. . . ." *Id.* at 578, 123 S.Ct. 2472.

¶ 56 In marked contrast to the situation presented to the Court in *Lawrence,* this case implicates the public institution of marriage, an institution the law protects, and also involves a minor. In other words, this case presents the exact conduct identified by the Supreme Court in *Lawrence* as outside the scope of its holding.

¶ 57 First, the behavior at issue in this case is not confined to personal decisions made about sexual activity, but rather raises important questions about the State's ability to regulate marital relationships and prevent the formation and propagation of marital forms that the citizens of the State deem harmful.

> Sexual intercourse . . . is the most intimate behavior in which the citizenry engages. [*Lawrence* ] spoke to this discreet, personal activity. Marriage, on the other hand, includes both public and private conduct. Within the privacy of the home, marriage means essentially whatever the married individuals wish it to mean. Nonetheless, marriage extends beyond the confines of the home to our society.

case's holding, however, it should come as no surprise that the *Lawrence* opinion has been distinguished more than forty times since it was issued. *See, e.g., Muth v. Frank,* 412 F.3d 808, 817 (7th Cir.2005) ("*Lawrence* . . . did not announce . . . a [constitutionally protected] fundamental right . . . to engage in all manner of consensual sexual conduct, specifically in this case, incest."); *United States v. Bach,* 400 F.3d 622, 628–29 (8th Cir.2005) (holding that *Lawrence* did not protect an adult from criminal

Joseph Bozzuti, Note, *The Constitutionality of Polygamy Prohibitions After Lawrence v. Texas: Is Scalia a Punchline or a Prophet?,* 43 Catholic Law. 409, 435 (Fall 2004).

¶ 58 The very "concept of marriage possesses 'undisputed social value.' " *Green,* 2004 UT 76, ¶ 72, 99 P.3d 820 (Durrant, J., concurring) (quoting *In re Marriage of Mehren & Dargan,* 118 Cal.App.4th 1167, 13 Cal. Rptr.3d 522, 523 (2004)). Utah's own constitution enshrines a commitment to prevent polygamous behavior. *See* Utah Const. art. III, § 1; *id.* art. XXIV, § 2. That commitment has undergirded this State's establishment of "a vast and convoluted network of . . . laws . . . based exclusively upon the practice of monogamy as opposed to plural marriage." *Potter v. Murray City,* 760 F.2d 1065, 1070 (10th Cir.1985). Our State's commitment to monogamous unions is a recognition that decisions made by individuals as to how to structure even the most personal of relationships are capable of dramatically affecting public life.

¶ 59 The dissent states quite categorically that the State of Utah has no interest in the commencement of an intimate personal relationship so long as the participants do not present their relationship as being state-sanctioned. On the contrary, the formation of relationships that are marital in nature is of great interest to this State, no matter what the participants in or the observers of that relationship venture to name the union. We agree with the dissent's statement that any two people may make private pledges to each other and that these relationships do not receive legal recognition unless a legal adjudication of marriage is sought.[11] *See infra* ¶ 145. That does not, however, prevent the legislature from having a substantial interest in criminalizing such behavior when there is an existing marriage.

sanction for taking pornographic photos of a sixteen-year-old).

11. Utah Code section 30–1–4.5 (Supp.2005) allows a court to order that an unsolemnized marriage is a legal and valid marriage so long as the relationship is between a man and a woman who are capable of giving consent and marrying, have cohabitated, have mutually assumed marital rights, duties, and obligations, and have held themselves out as husband and wife.

¶ 60 As the dissent recognizes, a marriage license significantly alters the bond between two people because the State becomes a third party to the marital contract. *Infra* ¶ 145. It is precisely that third-party contractual relationship that gives the State a substantial interest in prohibiting unlicensed marriages when there is an existing marriage. Without this contractual relationship, the State would be unable to enforce important marital rights and obligations. *See infra* ¶ 102. In situations where there is no existing marriage, the Legislature has developed a mechanism for legally determining that a marriage did in fact exist, even where the couple did not seek legal recognition of that marriage, so that the State may enforce marital obligations such as spousal support or prevent welfare abuse. *See* Utah Code Ann. § 30–1–4.5 (Supp.2005).[12] There is no such mechanism for protecting the State's interest in situations where there is an existing marriage because, under any interpretation of the bigamy statute, a party cannot seek a legal adjudication of a second marriage. Thus, the State has a substantial interest in criminalizing such an unlicensed second marriage.

¶ 61 Moreover, marital relationships serve as the building blocks of our society. The State must be able to assert some level of control over those relationships to ensure the smooth operation of laws and further the proliferation of social unions our society deems beneficial while discouraging those deemed harmful. The people of this State have declared monogamy a beneficial marital form and have also declared polygamous relationships harmful. As the Tenth Circuit stated in *Potter*, Utah "is justified, by a compelling interest, in upholding and enforcing its ban on plural marriage to protect the monogamous marriage relationship." 760 F.2d at 1070 (internal quotation marks omitted); *see also Green*, 2004 UT 76, ¶ 72, 99 P.3d 820 (Durrant, J., concurring) ("[Utah] has a compelling interest in prohibiting conduct, such as the practice of polygamy, which threatens [monogamous marriage].").

¶ 62 Further, this case features another critical distinction from *Lawrence*; namely, the involvement of a minor. Stubbs was sixteen years old at the time of her betrothal, and evidence adduced at trial indicated that she and Holm regularly engaged in sexual activity. Further, it is not unreasonable to conclude that this case involves behavior that warrants inquiry into the possible existence of injury and the validity of consent. *See, e.g., Green*, 2004 UT 76, ¶ 40, 99 P.3d 820 ("The practice of polygamy ... often coincides with crimes targeting women and children. Crimes not unusually attendant to the practice of polygamy include incest, sexual assault, statutory rape, and failure to pay child support.") (citing Richard A. Vazquez, Note, *The Practice of Polygamy: Legitimate Free Exercise of Religion or Legitimate Public Menace? Revisiting* Reynolds *in Light of Modern Constitutional Jurisprudence*, 5 N.Y.U.J. Legis. & Pub. Pol'y 225, 239–45 (2001)).

¶ 63 Given the above, we conclude that *Lawrence* does not prevent our Legislature from prohibiting polygamous behavior. The distinction between private, intimate sexual conduct between consenting adults and the public nature of polygamists' attempts to extralegally redefine the acceptable parameters of a fundamental social institution like marriage is plain. The contrast between the present case and *Lawrence* is even more

---

12. *See, e.g., Clark v. Clark*, 2001 UT 44, 27 P.3d 538 (seeking legal adjudication of marriage and a divorce to receive division of the marital assets); *Whyte v. Blair*, 885 P.2d 791 (Utah 1994) (seeking legal adjudication of marriage to receive automobile insurance benefits); *Kelley v. Kelley*, 2003 UT App 317, 79 P.3d 428 (extending alimony rights to include time of unsolemnized marriage); *Walters v. Walters*, 812 P.2d 64 (Utah Ct.App.1991) (seeking legal adjudication of marriage to receive property distribution and portion of retirement benefits); Floor Debate, 47th Leg., Gen. Sess. (Utah Feb. 17, 1987) (Senate recording tape no. 75) (statement of Sen. Stephen Rees) (stating that the purpose of the unsolemnized marriage statute is to "close some loopholes in welfare abuse"); *id.* (statement of Norman Angus, Director of State Social Services Administration) ("[A] woman with children ... may ... be living with an individual who could and in all probability does provide a substantial amount of support to that household and still we cannot consider any of the income or the resources of that individual available and therefore the woman can in fact qualify for a full public assistance grant....").

dramatic when the minority status of Stubbs is considered. Given the critical differences between the two cases, and the fact that the United States Supreme Court has not extended its jurisprudence to such a degree as to protect the formation of polygamous marital arrangements, we conclude that the criminalization of the behavior engaged in by Holm does not run afoul of the personal liberty interests protected by the Fourteenth Amendment. Having so concluded, we now address Holm's contention that our State's bigamy statute violates equal protection guarantees.

3. No Equal Protection Concerns Are Implicated by Utah's Bigamy Statute

¶ 64 Holm claims that his conviction for bigamy is unconstitutional because the bigamy statute unfairly discriminates against individuals who are religiously compelled to practice polygamy. We disagree.

¶ 65 Generally speaking, the Equal Protection Clause of the Fourteenth Amendment mandates that similarly situated individuals be treated in the same manner. *See City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In *Green,* we held that Utah's bigamy statute is facially neutral as to religion; in other words, it delineates no distinction between classes of individuals. 2004 UT 76, ¶ 25, 99 P.3d 820. "The statute does not ... mention polygamists or their religion." *Id.* One could engage in polygamy out of animus for religion and still be considered in violation of the statute. Quite simply, the statute is designed to punish behavior regardless of the motivations giving rise to that behavior.

¶ 66 Furthermore, in *Green,* we concluded that the facially neutral text of the bigamy statute is not merely a smokescreen meant to disguise a discriminatory intent to prosecute only religiously motivated polygamy. *Id.* ¶ 28. As we noted in *Green,* the last reported decision concerning a bigamy prosecution prior to *Green* involved a man engaging in non-religiously motivated polygamy. *Id.* Ironically, the defendant in that case argued that the State of Utah selectively prosecutes " 'only those bigamists who practice bigamy for other than religious reasons.' " *Id.* ¶ 28 n. 10 (quoting *State v. Geer,* 765 P.2d 1, 3 (Utah Ct.App.1988)). Although Holm asserts that discriminatory prosecution of bigamy occurs, the record before us is devoid of any meaningful evidence supporting that assertion. In light of our holding in *Green* that the bigamy statute is facially neutral and that its enactment was not intended to provide a vehicle for discriminatory actions, and in the absence of evidence giving credence to Holm's assertion of unequal treatment, we decline to find Holm's conviction violative of equal protection guarantees.

¶ 67 Having so concluded, we now turn to Holm's assertion that the bigamy statute is unconstitutional because it unduly infringes upon his right of association.

4. Criminalization of Polygamy Does Not Unduly Infringe upon the Right of Association

¶ 68 Holm claims that the State of Utah, by criminalizing polygamous behavior, has unjustifiably restricted his ability to teach his family the principle of plural marriage by way of example. According to Holm, such a restriction violates his right of association protected by the First Amendment of the United States Constitution. We conclude that Holm's right of association is not so broad as to render him immune from criminal sanction for polygamous behavior.

¶ 69 As an initial matter, we point out that the freedom of association protected by the federal constitution has been conceived of as covering two separate but related rights. As the United States Supreme Court acknowledged in *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), there are "two distinct senses" of the freedom of association, commonly referred to as intrinsic and instrumental association.

¶ 70 Holm argues that Utah's criminalization of polygamous behavior infringes upon his right of association in both senses. We disagree and conclude that Holm's rights to intrinsic and instrumental association have not been unduly restricted.

¶ 71 First, the concept of intrinsic association encompasses certain intimate associations. *Id.* Under this type of association, the United States Supreme Court has recognized that the freedom to form certain intimate associations is constitutionally protected, stating that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* In this sense, the "freedom of association receives protection as a fundamental element of personal liberty." *Id.* at 618, 104 S.Ct. 3244. When considering claims that a certain governmental action violates the right to intimate association, the United States Supreme Court has essentially conducted a fundamental liberty analysis to determine whether the type of behavior allegedly infringed upon is protected. *See id.* at 618–19, 104 S.Ct. 3244 (citing fundamental rights cases when identifying the characteristics of relationships possibly entitled to associational protection).

¶ 72 Holm's right to intrinsic association has not been unduly infringed upon because, as discussed above, *supra* ¶¶ 53–63, the right to engage in polygamous behavior is not encompassed within the ambit of the individual liberty protections contained in our federal constitution. Consequently, Holm cannot argue that his associational rights prevent the State from interfering with his ability to engage in properly criminalized behavior, as the right of intimate association protects only those associations that further or otherwise support fundamental liberty interests.

¶ 73 Second, instrumental associations include those associations "indispensable" to the "preserv[ation] [of] other individual liberties" including "those activities protected by the First Amendment." *Id.* at 618, 104 S.Ct. 3244. "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 622, 104 S.Ct. 3244.

¶ 74 Holm's right to instrumental association has not been infringed. We have already concluded that Utah's prohibition on polygamous behavior does not run afoul of constitutional guarantees protecting the free exercise of religion. Further, we see nothing contained within the language of the bigamy statute that prevents Holm from associating with a group advocating the social and spiritual desirability of a polygamous lifestyle. Although it is true that the bigamy statute prevents Holm from expressing his opinions regarding polygamy by engaging in polygamous behavior, we are not convinced that the State is constrained to tolerate constitutionally prohibited behavior in order to allow individuals to express their dissatisfaction with the criminal status of that behavior.

¶ 75 Accordingly, we conclude that Utah's prohibition against polygamous behavior does not violate Holm's First Amendment right to freedom of association.[13] We now turn to Holm's final federal constitutional argument, that the term "marry" is unconstitutionally vague.

5. The Term "Marry" Is Not Unconstitutionally Vague

¶ 76 Holm argues that if the term "marry," as used in the Utah Code, is not confined to legally recognized marriage, and therefore is broad enough to encompass his behavior, then the "purports to marry" prong of the bigamy statute must be struck down as impermissibly vague because the language of the statute fails to adequately define the type of activity that is being criminalized. Further, Holm argues that, if the term "marry" is not confined to legally recognized marriages, then he cannot be prosecuted for unlawful sexual conduct with a minor because the Utah Code immunizes "married" people from being subject to prosecution pursuant to that statute. We conclude that the lan-

---

13. Holm claims that the bigamy statute is facially unconstitutional because it is overbroad and implicates freedom of association concerns. Because we conclude that such concerns are not implicated and that Holm's conviction does not unduly infringe upon constitutional rights, we decline to address his overbreadth claim.

guage of the bigamy statute sufficiently put Holm on notice that his plural marriage to Stubbs would run afoul of this State's criminal law and that Holm cannot rely on the marriage defense in combating the charges of unlawful sexual conduct with a minor.

¶ 77 To survive a void-for-vagueness challenge, a criminal statute must (1) "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," and (2) "establish minimal guidelines" that sufficiently instruct law enforcement as to avoid arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (internal quotation marks omitted). Holm has raised both facial and as-applied vagueness challenges to the bigamy statute. As we concluded in *Green*, however, "a court should 'examine the complainant's conduct before analyzing other hypothetical applications of the law' when a challenged statute 'implicates no constitutionally protected conduct.'" 2004 UT 76, ¶ 44, 99 P.3d 820 (quoting *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)); *see also Vill. of Hoffman Estates*, 455 U.S. at 495, 102 S.Ct. 1186 ("A plaintiff who engages in some conduct that is clearly proscribed [by statute] cannot complain of the vagueness of the law as applied to the conduct of others."). As we have concluded that no constitutionally protected conduct has been restricted by Holm's conviction, it is inappropriate to consider Holm's facial vagueness challenge. As a result, we now consider whether, under the two-part test presented above, the bigamy statute is unconstitutionally vague as applied to Holm.

a. The Bigamy Statute Adequately Notified Holm That His Conduct Was Illegal

¶ 78 We first consider whether the language of our bigamy statute is so vague as to have provided inadequate notice to Holm that his marriage to Stubbs would violate our State's bigamy statute.

¶ 79 Holm argues that he was not put on notice that his marriage to Stubbs would violate the "purports to marry" prong of the bigamy statute because an ordinary person would consider that prong to criminalize only attempts to enter into a second legally recognized marriage or assertions that a second legally recognized marriage has occurred. We disagree.

¶ 80 Holm once again relies on the *Black's Law Dictionary* definition of "marriage" to argue that the terms "marry," "husband," and "wife" refer to situations in which an intimate union has been legally recognized. *See Black's Law Dictionary* 986 (7th ed.1999) (defining "marriage" as "[t]he legal union of a man and woman as husband and wife"); *id.* at 746 (defining "husband" as "a man who has a lawful wife living"). As discussed extensively above, however, *Black's Law Dictionary* itself bears out the broader implications of the term, *supra* ¶¶ 19–21, and the term "marry" or "marriage" cannot be so neatly cabined to refer only to legally recognized relationships.

¶ 81 Looking only to the plain language of our bigamy statute, we are at a loss to comprehend how Holm can plausibly argue that he did not purport to marry Stubbs when he participated in a marriage ceremony with her and subsequently engaged in a relationship that mirrored that of a traditional marriage. By its terms, the bigamy statute is designed to prevent individuals from engaging in two marital relationships simultaneously. *See Green*, 2004 UT 76, ¶ 47, 99 P.3d 820 ("Indeed, Green's conduct produced precisely the situation that bigamy statutes aim to prevent—all the indicia of marriage repeated more than once."). We conclude that Holm was provided adequate notice by the "purports to marry" prong of our bigamy statute that his marriage to Stubbs would be considered criminal behavior. *See id.* ¶ 49 ("Words are symbols of communication and as such are not invested with the quality of a scientific formula. It is enough that they can be construed with reasonable certainty.").

¶ 82 Holm argues, however, that if the "purports to marry" prong of the bigamy statute is not unconstitutionally vague, then

the term "married," as used in section 76–5–407(1) of the Utah Code, which provides that sexual conduct with a minor is not unlawful if the participants in the conduct are "married to each other," Utah Code Ann. § 76–5–407(1) (2003), must protect him from prosecution for unlawful sexual conduct with a minor.[14] Essentially, Holm argues that he received inadequate notice that his purported marriage to Stubbs would not immunize him from prosecution for unlawful sexual conduct with a minor for engaging in sexual activity with Stubbs. We disagree and conclude that Holm was on notice that his marriage to Stubbs would not serve as a defense to a subsequent prosecution for unlawful sexual conduct with a minor.

¶ 83 If Holm's understanding of section 76–5–407 is correct, the statute would not be applicable to sexual conduct occurring in unlicensed marital unions. In other words, the intent of the parties engaging in the sexual conduct could determine, without state input or control, whether their sexual conduct amounts to a criminal offense. A criminal prohibition like that established by the unlawful sexual conduct statute cannot be so easily subverted. Considering that the Utah Code prohibits and criminalizes the existence of a marriage when one marriage already exists, it is absurd to conclude that the existence of the second, prohibited marriage insulates Holm from prosecution under the unlawful sexual conduct statute. Quite simply, a person of ordinary intelligence is on notice, as a matter of common sense as much as a matter of statutory language, that criminal conduct cannot provide a defense for criminal conduct.

¶ 84 We therefore reject Holm's assertion that he had insufficient notice that his illegal marriage to Stubbs would not insulate him

from prosecution pursuant to the unlawful sexual conduct statute.

b. The Bigamy Statute Was Not Enforced Against Holm in an Arbitrary or Discriminatory Manner

¶ 85 We next consider whether "the [bigamy statute] is sufficiently definite … as to discourage arbitrary and discriminatory enforcement." *Green*, 2004 UT 76, ¶ 50, 99 P.3d 820. As stated by the United States Supreme Court, criminal statutes must "establish minimal guidelines to govern law enforcement" to avoid the risk of leaving the task of "lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender v. Lawson*, 461 U.S. 352, 358, 360, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (internal quotation marks omitted). When confronted with an as-applied challenge to the constitutionality of a criminal statute, "it is the application of the [challenged statute] to defendant[ ] by law enforcement officials we review." *United States v. LaHue*, 261 F.3d 993, 1007 (10th Cir.2001).

¶ 86 Just as we determined in *Green* "that law enforcement officials encountering Green's circumstances would not be left to pursue their own personal predilections in determining the applicability of Utah's bigamy statute," 2004 UT 76, ¶ 52, 99 P.3d 820, we conclude that no reasonable law enforcement official acquainted with Holm's behavior could conclude other than that Holm had violated Utah law. As discussed above, *supra* ¶¶ 29–31, the facts clearly establish that Holm purported to marry Stubbs while already having a wife.

¶ 87 Having concluded that Holm's prosecution does not run afoul of the federal constitution, we now turn to Holm's contention that the trial court erred by not allowing

14. In both the table of contents and the heading of his opening brief, Holm asserted that section 76–5–401.2 is "void for vagueness." But the discussion in the body of his brief regarding the vagueness of the term "marry" does not refer to section 76–5–401.2, and indeed the word "marry" does not appear in section 76–5–401.2. It is evident that Holm's vagueness discussion was meant to apply not to section 76–5–401.2 but to section 76–5–407, which indicates that the provisions in part 4 of chapter 5 of Title 76, including

section 76–5–401.2, "do not apply to consensual conduct between persons *married* to each other." Utah Code Ann. § 76–5–407(1) (2003) (emphasis added). Accordingly, we construe Holm's argument as a claim that he had insufficient notice that his conduct violated section 76–5–401.2 because the term "married" in section 76–5–407(1) is vague. *See State v. Green*, 2004 UT 76, ¶ 43, 99 P.3d 820 (recognizing that "[v]agueness questions are essentially procedural due process issues" (internal quotation marks omitted)).

expert testimony addressing the social history and health of polygamous communities.

### D. The Trial Court Properly Excluded Holm's Proffered Expert Testimony

¶ 88 Holm contends that the trial court erred by not allowing him to put into evidence expert testimony addressing the social history and health of polygamous communities. Specifically, Holm argues that such testimony was necessary to rebut the notion that polygamous communities are rife with abuse and victimize children. We conclude that the trial court did not abuse its discretion by not admitting the testimony in question.

¶ 89 Rule 702 of the Utah Rules of Evidence allows an expert to testify to "scientific, technical, or other specialized knowledge," if that testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." A decision to admit or exclude expert testimony is left to the discretion of the trial court, and that decision will not be reversed unless it constitutes an abuse of discretion. *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794.

¶ 90 In this case, the trial court concluded that expert testimony relating to the history of polygamy in Utah and the social health of polygamous communities would not aid the trier of fact in determining the factual questions before it. Historical context and evidence as to the social health of polygamous communities have no bearing on the factual predicate for a bigamy or unlawful sexual conduct prosecution. The questions put to the jury were, in fact, only tangentially related to the broader concerns of history and social health. The jury was charged with the task of determining whether Holm purported to marry or cohabited with Stubbs while knowing he already had a wife, whether Holm engaged in sexual activity with Stubbs when she was sixteen or seventeen, and whether Holm is ten years her senior. Holm's proffered testimony as to the history

and social health of polygamous communities, which spans nearly thirty pages of transcript, would not have aided the jury in determining the questions before it and would more likely have distracted and confused the jury. As a result, we conclude that the trial court did not abuse its discretion by excluding the expert testimony.

## II. WE AFFIRM HOLM'S CONVICTION FOR UNLAWFUL SEXUAL CONDUCT WITH A MINOR

¶ 91 Holm was convicted on two counts of unlawful sexual conduct with a minor under Utah Code section 76–5–401.2 (2003), which makes it unlawful for individuals to engage in sexual conduct, as defined by that statute, with partners who are at least ten years their junior and who are sixteen or seventeen years old. Holm argues that his conviction under this statute must be overturned because (1) the trial court had no jurisdiction over these charges and (2) the statute as applied to Holm violates the Equal Protection Clause. We address each of these claims below.

### A. The Trial Court Had Criminal Jurisdiction over Holm's Unlawful Sexual Conduct with a Minor Charge

¶ 92 Holm asserts that the trial court lacked jurisdiction over the charges of unlawful sexual conduct levied against him under section 76–5–401.2 because the State failed to prove by a preponderance of the evidence that the sexual conduct in question occurred in Utah. We reject this claim for the reasons discussed below.

¶ 93 The Utah Criminal Code provides that, in the absence of facts establishing attempt, solicitation, or conspiracy, a Utah trial court has criminal jurisdiction over an individual's prosecution "for an offense which he commits ... by his own conduct" only if "the offense [itself] is committed either wholly or partly within the state." - Utah Code Ann. § 76–1–201(1)(a) (2003) (amended 2004).[15] The jurisdiction determination is a matter for the trial court, not the jury, and

---

15. We note that Utah Code section 76–1–201 was amended in 2004. The current version of the statute appears to require the defendant to file a

pretrial motion in order to challenge jurisdiction. *See* Utah Code Ann. § 76–1–201(5)(b) (Supp. 2004). Unless otherwise indicated, our refer-

the court itself must resolve any associated factual disputes by a preponderance of the evidence. *Id.* §§ 76–1–201(5), –501(3); *State v. Payne*, 892 P.2d 1032, 1033 (Utah 1995). While Holm asserts that the magistrate should have made such a finding at the probable cause hearing, we again clarify that the trial court's obligation to make this determination arises after the bindover order is issued and the information is transferred to the trial court. *See State v. Humphrey*, 823 P.2d 464, 465–67 & nn. 2, 5 (Utah 1991) (explaining that the role of the magistrate in the probable cause hearing differs from that of a trial judge even where the individual playing the role of magistrate holds judicial office). The trial court may order charges dismissed "either on its own initiative or upon application of either party" if it determines that the court "is without jurisdiction." Utah R.Crim. P. 25(b)(4); *see Payne,* 892 P.2d at 1033.

¶ 94 Here, Holm was bound over for trial on two counts of unlawful sexual conduct with a sixteen- or seventeen-year-old. Holm argues that he was bound over "only on the two specific instances leading to conception" of his first two children with Ruth Stubbs. He therefore asserts that the trial court's jurisdiction depended on the State proving by a preponderance of the evidence that these "two specific instances" of sexual intercourse occurred in Utah.

¶ 95 In fact, however, the information specified that the two counts of unlawful sexual conduct referred respectively to conduct that had occurred "[s]ometime between December 13, 1998 and April, 1999," and to conduct that had occurred "[s]ometime between January 1, 2000 and June 1, 2000, in Washington County, ... Utah." Neither the information nor the bindover order included the conceptions of the two children as part of the charged crime. Thus, the State was not obligated to prove where the conceptions occurred—a nearly impossible task, as the trial court noted—but only that it was more likely than not that Holm had engaged in some instance of sexual conduct with Stubbs in Utah during the charged periods.

 ¶ 96 The trial court appears to have understood Holm's objection on this

issue as a sufficiency of the evidence argument rather than a jurisdictional argument. It denied Holm's motion to dismiss on these grounds because it could not conclude "that no reasonable jury could find the defendant guilty on the evidence presented." The State argues that Holm failed to clarify that he was asking the trial court to determine jurisdiction and that Holm therefore waived any jurisdictional claim. Even assuming Holm failed to raise the jurisdictional issue, however, we would not consider it waived. Criminal jurisdiction is a form of subject matter jurisdiction. *See State v. Amoroso*, 1999 UT App 60, ¶¶ 16–18, 975 P.2d 505; *see also State v. Alagao*, 77 Hawai'i 260, 883 P.2d 682, 683 (App.1994) (referring to "[j]urisdiction of the offense charged" as "subject matter jurisdiction"). Thus, a trial court or an appellate court may dismiss a criminal charge for lack of criminal jurisdiction at any time, regardless of whether the defendant raised the issue before or during trial. *See Myers v. State*, 2004 UT 31, ¶ 16, 94 P.3d 211; *Payne,* 892 P.2d at 1033.

¶ 97 In this case, given our clarification above of the charges at issue, we think it clear that the trial court did have jurisdiction. Stubbs testified at trial that she lived together with Holm at their Hildale residence during the charged periods and that it was "common for [her] to have sexual intercourse [with him] at the house in Hildale, Utah." This undisputed testimony—together with the undisputed facts that Holm and Stubbs had entered into a religious union, that they considered themselves married, and that Stubbs conceived two children during the charged periods—readily leads to the conclusion that the trial court's jurisdiction was established by a preponderance of the evidence. The fact that Holm and Stubbs also traveled out of state during these periods, "sometimes as often as twice a month," according to Holm, does not change our assessment.

*B. Holm's Conviction for Unlawful Sexual Conduct Does Not Violate His Constitutional Right to Equal Protection*

 ¶ 98 Holm's final argument regarding his unlawful sexual conduct convictions is

ences in this opinion are to the version of section 76–1–201 in effect at the time of Holm's trial.

that section 74–5–401.2 violates his federal right to equal protection under the law because it impermissibly distinguishes between married and unmarried individuals. We disagree for the reasons set forth below.

¶ 99 The federal Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Thus, state laws must treat similarly situated people alike unless a reasonable basis exists for treating them differently." *State v. Lafferty*, 2001 UT 19, ¶ 70, 20 P.3d 342 (internal quotation marks omitted). Where no suspect classification or violation of a fundamental right is involved, a difference in treatment "need be only rationally related to a valid public purpose" to withstand equal protection scrutiny. *Id.* ¶ 71. Here, Holm does not argue that we should apply anything other than such rational basis scrutiny. *See Eisenstadt v. Baird*, 405 U.S. 438, 447, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (applying rational basis scrutiny to a statute that treated individuals differently based on their marital status).

¶ 100 We accept Holm's claim that individuals who engage in sexual conduct with partners who are at least ten years their junior and who are sixteen or seventeen years old are "similarly situated" for purposes of equal protection analysis regardless of the marital relationship between those involved. In the context of a defendant convicted under a criminal law, we have determined whether individuals are "similarly situated" by referring to the conduct for which the defendant was convicted. *See State v. Honie*, 2002 UT 4, ¶ 21, 57 P.3d 977 (holding that those convicted of felony murder were not similarly situated to those convicted of aggravated murder because the elements of the crimes were different); *State v. Moore*, 782 P.2d 497, 503 (Utah 1989) (holding that all individuals who deal drugs within 1,000 feet of a school were similarly situated with regard to a statute providing enhanced penalties for those engaged in such conduct); *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146, 147 (1969) (indicating that those found in possession of LSD were similarly situated with regard to two statutes providing different penalties for the same conduct). Utah Code section 76–5–401.2 defines the crime of unlawful sexual conduct with a sixteen- or seventeen-year-old. Section 76–5–407 exempts a married individual from operation of the unlawful sexual conduct statute where the individual engages in the proscribed conduct with his or her spouse. *Id.* § 76–5–407(1). Thus, a distinction based on marital relationship is made among those who engage in the conduct proscribed by section 76–5–401.2.[16] We therefore proceed to the question of whether this distinction is rationally related to the purpose of section 76–5–401.2.

¶ 101 Holm argues that the State has no rational justification for endorsing consensual sexual conduct between a sixteen- or seventeen-year-old girl and a man ten years her elder where the two have entered a legal marriage with the consent of one of the girl's parents, under Utah Code section 30–1–9 (Supp.2005), while criminalizing such conduct where the two are not legally married. He points out that if the distinction is based solely on the minor's inability to give valid consent, such a concern would not apply in this case because Stubbs's father consented to her religious union with Holm. Contrary to Holm's suggestion, we agree with the State that its interest in the distinction goes beyond any concern with obtaining parental consent. The state-determined framework

---

**16.** We note that our equal protection analysis would be no different, in practical terms, if we construed section 76–5–401.2 in combination with section 76–5–407(1) as including the lack of a marital relationship between the parties as an element of the crime rather than viewing section 76–5–407(1) as exempting those within a marital relationship from operation of section 76–5–401.2; we would still be required to assess whether the resulting definition of the class, including the lack of a marital relationship, was rationally related to the purpose of the statute.

*See McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) ("The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose...."); Laurence H. Tribe, *American Constitutional Law* § 16–2, at 1439–40 (2d ed.1988) (noting that an analysis in which "persons or activities treated differently by government could for that very reason be deemed not 'the same'" would "afford[ ] virtually no scope for review").

within which the legal status of marriage exists provides a minor with certain protections under the law that are absent where the union is not a legal marriage and thus falls outside this framework.

¶ 102 The protections afforded persons who are married in the eyes of the law include rights, vis-a-vis their spouses, to support and maintenance, Utah Code Ann. § 30-4-1 (1998), to the fulfillment of certain procedural requirements before the union can be dissolved, *id.* § 30-3-1, to a fair distribution of property and debt obligations in the event such a dissolution occurs, *id.* § 30-3-5 (Supp.2005), and to inherit all or a portion of the spouses' estates in the event of their death, *id.* §§ 75-2-102, -202 (Supp.2005). These examples represent only a few of the instances in which marital status is legally relevant. It is true that the distribution of assets within or following a marriage may to a certain extent be determined by a premarital agreement between the parties, *id.* § 30-8-4 (1998), and that unmarried partners may make arrangements for property distribution by private contract or will. We do not believe, however, that such private arrangements significantly alter, in the former case, or are in any sense equivalent to, in the latter case, the protection provided by the network of laws surrounding the legal institution of marriage. Marriage is unique because it is buttressed by this network of laws, which in many instances overrides any attempt by a married individual to circumvent their requirements. Having provided such a framework of support, the State may rationally distinguish between minors who are within its protection and those who are not.

¶ 103 While the State's power to interfere with the private relationships of consenting adults is limited, it is well established that the same is not true where one of the individuals involved in the relationship is a minor. *See State v. Elton,* 680 P.2d 727, 732 (Utah 1984) (accepting the proposition "that young people should be protected from sexual exploitation by older, more experienced persons until they reach the legal age of consent and can more maturely comprehend and appreciate the consequences of their sexual

acts"). We believe the State has a legitimate interest in criminalizing the conduct at issue and that the Legislature's decision to criminalize the conduct only where the parties involved are not married to each other does not render the statute invalid under equal protection principles. We therefore uphold the constitutionality of Holm's convictions under section 76-5-401.2.

## CONCLUSION

¶ 104 We conclude that Holm was properly convicted of both bigamy and unlawful sexual conduct with a minor. As to the bigamy conviction, we conclude that Holm's behavior falls squarely within the terms of the "purports to marry" prong of the bigamy statute, that his conviction pursuant to that prong did not run afoul of any state or federal constitutional right, and that the trial court did not abuse its discretion by excluding expert testimony relating to the social history and health of polygamous communities.

¶ 105 As to the sexual-conduct-with-a-minor conviction, we conclude that Holm was properly convicted because the trial court had jurisdiction over him and because such conviction did not violate his constitutional right to equal protection. Accordingly, we affirm the judgment of the trial court.

¶ 106 Associate Chief Justice WILKINS and Justice PARRISH concur in Justice DURRANT's opinion.

NEHRING, Justice, concurring:

¶ 107 I concur in the judgment of the majority. I write separately to address several of the important criticisms of the majority's analysis made by the Chief Justice that I believe the majority does not fully confront. These matters raised in the dissent deserve an answer because, despite the considerable persuasive force of the majority opinion, the conclusion reached today that the State may use its power to declare criminal consensual expressions of commitment between adults is one that by no means overwhelms Mr. Holm's counterarguments—specifically, his argument that the State lacks such power under the constitutions of the United States and the State of Utah.

¶108 My misgivings over whether the power of the State may be constitutionally exercised to criminalize private relationships among adults led me to join in Chief Justice Durham's concurring opinion in *State v. Green*, 2004 UT 76, 99 P.3d 820, one of our recent examinations of polygamy. My uneasiness over the due process implications of state intrusion into private, consensual relationships voiced by the Chief Justice's concurrence in *Green*, together with the personal and institutional considerations that I will shortly disclose, compels me to satisfy myself that the outcome of this case be anchored to a particularly solid legal foundation. I can, therefore, be at ease with joining the majority in Part I of its opinion only by overcoming to my satisfaction several of the Chief Justice's important points of disagreement with the lead opinion.

¶109 Of course, this case is not unique because it presents close questions. Close cases are a staple of this court's docket. This case stands apart from other cases that put us to the test of wrestling uncertainty into submission because it probes a particularly sensitive area of our state's identity. No matter how widely known the natural wonders of Utah may become, no matter the extent that our citizens earn acclaim for their achievements, in the public mind Utah will forever be shackled to the practice of polygamy. This fact has been present in my consciousness, and I suspect has been a brooding presence in one form or another in the minds of my colleagues, from the moment we opened the parties' briefs. I also suspect that I have not been alone in speculating what the consequences might be were the highest court in the State of Utah the first in the nation to proclaim that polygamy enjoys constitutional protection. These musings have left me with little doubt that the predominant reaction to a holding in keeping with the Chief Justice's dissent would be highly charged and unflattering.

¶110 It would be a violation of my oath of office to permit my apprehensions about the public reaction to any ruling of this court to participate in my decision-making effort or to influence in any way my vote on a case. Moreover, I do not intend to suggest that the majority opinion is in any way shaped by fears of a public backlash against sanctioning polygamy. If I believed otherwise, I would not join in it. I hasten to add, however, that it is not altogether clear to me that we would betray our oath were we to take into account the potential effects of the outcome of a case on the institutional reputation of this court and public confidence in the integrity of the rule of law. No small part of the responsibility that the members of this court agree to assume is to stand resolutely against majority will when constitutional principles require it. We shoulder this duty willingly despite knowing that the decisions we make will inevitably vex, frustrate, and enrage many people, including persons of power and influence. Still, an outcome that is wholly defensible as a product of intellectual rigor and principled application of the law could, at the same time, be so much at odds with widely and deeply held cultural values that it would not only undermine the legitimacy of the ruling but call into question the institutional legitimacy of the court.

¶111 I will not use this concurrence to embark on a lengthy exploration of this question of judicial philosophy and ethics. Rather, I raise it only to explain my reasons for writing separately. My awareness of the cultural and political volatility that polygamy brings to this court leaves me with a need to redouble my conviction that the flaws that the dissent perceives in the majority's analysis are confronted. I also write to distance myself from assertions made by the majority that, in my view, may be interpreted to invite, in the name of protecting marriage, unconstitutional governmental intrusions into consensual private relationships.

¶112 The organizing theme of the dissent is that when the Utah bigamy statute, section 76–7–101 (2003), uses the word "marry," the meaning of that term is limited to a legal union. With the definition of "marry" confined in this way, one can "purport to marry" and thereby become a bigamist in the eyes of the law only by professing participation in multiple legal unions. According to the dissent, if marriage were to include extralegal or spiritual unions as the majority insists, one could expect to find some evidence of

this broader definition in other provisions of Utah law where "marry" or "marriage" appears. But in every other context, including the recently enacted constitutional amendment, article I, section 29 (directed at heading off the recognition of same-sex marriages in our state), our statutes equate marriage with its legal status.

¶ 113 I conclude, however, that there is ample justification to disregard comparisons between the "purport to marry" use of the term "marry" in the bigamy statute with other statutory provisions in which "marry," or its variations, is used to describe policy considerations which, although they relate to marriage, have nothing to do with polygamy. A consistent definition of any term throughout the expanse of the Utah Code might be a laudable objective, and one that is sometimes achieved. Definitions often, however, shift in keeping with the purpose and intent of the statute in which a term is deployed. The "simple grammatical extrapolation" used by the dissent to restrict culpability for "purporting to marry" to persons laying claim to a legal union is not as simple as the Chief Justice would have it be.

¶ 114 As a general proposition, the array of statutes that address marriage speak to the question of who can and who cannot enjoy the status of a legally recognized married person either by choice or, in the case of valid unsolemnized marriages, by operation of law. Utah Code Ann. § 30–1–4.5 (Supp. 2005). These statutes clearly have some relevance to the question of plural marriage, a relevance that appears in two ways. First, those statutes that define who may and who may not become lawfully married unequivocally place polygamists in the group that cannot claim legal legitimacy for additional unions, however formed, created while one of the parties is a spouse in a marriage recognized under Utah law. In addition, the unsolemnized marriage statute, section 30–1–4.5, may assign legal status to one of a plural marriage participant's relationships and thereby expose the polygamist "husband" to prosecution for bigamy. Thus, in *Green* we affirmed the bigamy conviction of a defendant whose knowledge that he had a wife at the time he formed a spiritual union with

another woman—knowledge that is a necessary element of bigamy—was founded on a judicial determination he had entered into a legal unsolemnized marriage. I do not share, however, the dissent's view that the statutory expression of public policy to "recognize[ ] as marriage only the legal union of a man and woman" forecloses the use of the term "marry" to describe unions not entitled to legal recognition.

¶ 115 Our legislature has gone to considerable lengths to define who is eligible to be married and who is not. *See* Utah Const. art. I, § 29 (article I, section 29 provides legislative insight because, as a constitutional amendment, it traversed the legislature); Utah Code Ann. §§ 30–1–1 to –17.2 (1998). It has approached this task using marriage in a manner consistent with its overall objective of discriminating between who may be married and who may not. There is little in the provisions of Utah law relied on by the dissent to support its view that we should borrow our understanding of "marry" in the context of bigamy from its "legal" definition as used in Title 30 to define who is eligible to marry. There is a good reason for this. Describing the characteristics of those who may legally marry is a fundamentally different exercise from that of defining and proscribing polygamy. Rules that identify the characteristics of those deemed eligible to acquire the status of legal marriage need not necessarily be complementary to or symmetrical with definitions used to describe unions that the law proscribes as criminal. Both the statutes that define and regulate legal marriages and the statute that proscribes bigamy concern marriage, but the differing objectives of each make risky the interchange of concepts and definitions between the statutory provisions that relate to each.

¶ 116 The difficulty inherent in finding consistent language that applies coherently both to formulating legal marriages and to proscribing polygamous unions is evident in the approach the legislature has taken in constructing the Utah marriage chapter. The expression of public policy seized upon by the dissent to justify its conclusion that the definition of marriage is synonymous with legally recognized marriage takes on a different cast

when it is considered in the context of the conceptual approach taken to marriage throughout chapter 1 of Title 30. If the legislature had structured the marriage provisions of this chapter in a manner consistent with its declaration of public policy, one would expect to find relationships that qualified as marriage on one side of the statutory ledger and those that were not marriage on the other. Instead, the legislature chose to assign the term "marriage" to every form of intimate relationship, be it incestuous, polygamous, involving a minor, or between persons of the same sex, and only then, after bestowing upon all of these relationships the label of "marriage," assigned to each the legal status of lawful, void, prohibited, or valid. Thus, when section 30–1–2 pronounces that "[t]he following marriages are prohibited and declared void," and then heads the roster of prohibited and void marriages with the circumstance "when there is a husband or wife living, from whom the person marrying has not been divorced," the limitations of the dissent's grammatical extrapolation become quite clear. The statute expressly labels the polygamous union a "marriage" and then describes the act of the polygamous partner who joins in that union as "marrying." This use of the terms "marriage" and "marry" could not conceivably have been intended to confer legal status on the unions enumerated in section 30–1–2. In fact, the intention was quite the opposite. Nevertheless, the statute unmistakably considers the unions that it rejected as prohibited and void as "marriages" created by the act of "marrying." I therefore conclude that the structure of our statutory treatment of "marriage" demands rather than forecloses an expansive definition of marriage.

¶ 117 I am also unpersuaded by the dissent's attempt to bring the prohibition of polygamy imposed by our constitution into harmony with its statutory interpretation of "marry" by asserting that the "irrevocable ordinance," as article III, section 1 of the Utah Constitution is commonly known, was intended only to block legal recognition of plural marriages. The lead opinion ably makes the case that the framers of the Utah Constitution thought otherwise and intended to perpetuate criminal sanctions against practitioners of plural marriage. The Chief Justice advances a historical argument that the Enabling Act represented the last in a series of congressional measures commencing with the Morrill Act of 1862 that sought to prohibit the legal recognition of polygamous unions. This hypothesis does not properly account, in my view, for the incredulity that would have met such an interpretation in the Congress that enacted the Enabling Act. I believe that the historical record confirms that if, in fact, the drafters of Utah's proposed constitution had intended to interpret the irrevocable ordinance to ban only the legal recognition of polygamist unions, Utah's territorial status would have endured well into the twentieth century.

¶ 118 For its part, Congress had shown little reservation against imposing criminal penalties on polygamists. *See, e.g.*, Edmunds–Tucker Act, ch. 397, 24 Stat. 635 (1887); Edmunds Act, ch. 47, 22 Stat. 30 (1882); Morrill Act, ch. 126, 12 Stat. 501 (1862). In the Utah Territory, statehood proponents were certainly conscious of this when in 1887 they submitted a proposed constitution containing provisions declaring polygamy to be a misdemeanor, setting out penalties for violators, and removing the power of pardon for polygamy offenses from Utah officials. L. Rex Sears, *Punishing the Saints for Their "Peculiar Institution": Congress on the Constitutional Dilemmas*, 2001 Utah L.Rev. 581, 626 n. 314. This provision met with resistance from at least one senator who believed that the restriction on the power to pardon violated the equal-footing doctrine. *Id.* at 626 n. 316.[1]

¶ 119 By the time the Enabling Act passed Congress in 1894, LDS Church President Wilford Woodruff had issued the 1890 "Manifesto" renouncing Church sanction of polygamy, and a majority of the House Committee on the Territories was persuaded that the

---

1. A comprehensive and able account of the constitutional issues associated with the federal government's attempt to extirpate polygamy in the Utah Territory and those related to Utah's efforts to gain statehood, can be found in L. Rex Sears, *Punishing the Saints for Their "Peculiar Institution": Congress on the Constitutional Dilemmas*, 2001 Utah L.Rev. 581.

polygamy "problem" had been overcome. *Id.* at 627. Skepticism about polygamy's demise endured, however, resulting in the introduction of several anti-polygamy amendments to the Act. Among the objections that ultimately doomed proposals to require that the Utah Constitution expressly criminalize polygamy was the concern that congressional imposition of what amounted to a criminal statute forbidding polygamy would uniquely intrude on Utah's sovereignty and thereby unconstitutionally discriminate against the State in violation of the equal-footing doctrine. *Id.*

¶ 120 The compromise language of the irrevocable ordinance that now appears as article III, section 1 of our constitution does not denominate polygamy as a crime, nor does it include a mandate that the legislature enact statutes imposing criminal penalties for its practice. The irrevocable ordinance is therefore susceptible to the interpretation espoused in the dissent: that it forbids only state endorsement of polygamy. It is not, however, an interpretation backed up by historical evidence sufficient to satisfactorily establish that Congress had been overcome by a theretofore unknown toleration for any form of polygamy. Even though the Manifesto and allied assurances made by statehood advocates about the elimination of the doctrine and practice of polygamy in Utah did much to mollify congressional suspicions about the enduring presence of plural marriage, there remained a clear congressional expectation that Utah's state legislature would view its duty under the irrevocable ordinance as requiring more than merely to check any impulse to extend legal validation to plural marriage.

¶ 121 However one may evaluate the relative importance of the various rationales that contributed to the adoption of the text of the irrevocable ordinance, I am unable to accept the interpretation of the Chief Justice that it constituted congressional surrender to the authority of the LDS Church to preserve polygamy in its sacramental form while banning only recognition of plural marriages by civil authorities. Congress left little doubt about its expectation that the Utah Territory would not be welcomed into the Union without adequate assurances and evidence to support those assurances that polygamy had been banished. When the House Committee on the Territories issued its majority report endorsing the Enabling Act, it reflected its high expectations for the renunciation of plural marriage when it proclaimed "without doubt or hesitation that the institution of polygamy as taught by the Mormon Church, whether of faith or practice, is now absolutely stamped out and exterminated." *Id.* at 624 n. 308. This statement does not suggest that the Committee was merely concerned with the extermination of the threat that Utah would extend legal status to polygamous unions. Moreover, by the time Congress undertook an assault on the institution of the LDS Church by enacting the Edmunds–Tucker Act in 1887, which, among an array of measures designed to bring polygamy to heel, disincorporated the Church, LDS Church leaders had abandoned claims to legal legitimacy for polygamous unions and retreated to the more defensible ground of asserting a spiritual mandate for them while disavowing any secular blessing on them. *Id.* at 625.

¶ 122 By expressly noting that it was persuaded of the sincerity of LDS Church assurances that it had renounced polygamy in the realm of church as well as state, the Committee majority clearly signaled that it intended to condition Utah statehood on the abolition of polygamy in all of its forms and not merely on the promise of the state government that it would not confer legal status on polygamous unions. As the Chief Justice notes, there is evidence that the federal government softened its stance on prosecuting polygamists after the Manifesto was issued in 1890. It would be a mistake, however, to interpret a shift in law enforcement policy as evidence of a nascent tolerance of polygamy generally. To most, polygamy remained an evil to be eradicated. Rather, any relaxation of the federal government's zeal to prosecute polygamists is best explained by a willingness to tolerate pre-Manifesto polygamous unions in return for the assurance that no new polygamous unions would be countenanced. As explained by Senator Philander Knox, the irrevocable ordinance did not mandate "[t]he destruction of their existing families." *Id.* at 654 n. 490.

¶ 123 The Chief Justice suggests further that the drafters of the Utah Constitution read into the absence of a prohibition against cohabitation in the irrevocable ordinance a belief that Congress had acquired a new-found acceptance of the living arrangements attendant to religiously sanctioned plural unions. While there is evidence that Utah officials were sensitive to a distinction between polygamy and polygamous cohabitation, there is no evidence in the debate over the content of the irrevocable ordinance that Congress intended to give its approval to polygamous cohabitation. On this point, it is telling that when Congress became aware that some in this state had taken the view that the federal government did not intend to proscribe polygamous cohabitation, it saw to it that the irrevocable ordinances included within the enabling acts for New Mexico and Arizona expressly prohibited polygamous cohabitation. *Id.* at 654 n. 491.

¶ 124 The effort to deny Reed Smoot, chosen to represent Utah in the United States Senate in 1902, his seat in that body lends further support to the view that Congress intended the Enabling Act and irrevocable ordinance to reach religious marriages as well as legally sanctioned unions. Mr. Smoot was a monogamist but served as a member of the Quorum of the Twelve Apostles of the LDS Church. Mr. Smoot's opponents based their objections to his eligibility to serve as a senator more on Smoot's LDS Church affiliation than his qualifications for office. The Quorum, together with the Church president and the president's two counselors, comprises the central ruling authority of the Church.

¶ 125 By 1904 when Church President Joseph F. Smith testified before the United States Senate in support of Mr. Smoot's effort to secure his senate seat, much of the congressional goodwill generated by hope that the Manifesto represented a sincere commitment by the LDS Church to sever all ties with the faith and practice of polygamy had dissipated in the face of strong evidence that Church officials continued to solemnize polygamous unions and evasive protestations of the Church to the contrary. Kathleen Flake, *The Politics of American Religious Identity: The Seating of Senator Reed Smoot, Mormon Apostle* (Univ. N.C. Press 2004).

¶ 126 Although Smoot ultimately took his seat in the Senate, the clear lesson to be drawn from the travail he endured before taking the oath of office was that congressional animus toward polygamy extended well beyond the realm of legal recognition for plural marriages in Utah.

¶ 127 Finally, my conviction that the State may, and in fact must, criminalize polygamy leads me to conclude that the Chief Justice's invocation of *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), is misplaced. I agree generally with the majority opinion's discussion of the inapplicability of *Lawrence* to polygamy and to legislative attempts to criminalize its practice. While I believe that the result in *Lawrence* can be reached by principled legal reasoning, that reasoning largely resides in the equal protection approach advanced by Justice O'Connor in her concurrence. *Id.* at 579, 123 S.Ct. 2472. By reaching the conclusion that sexual relations between consenting homosexual adults enjoy constitutional protection as a substantive liberty interest, the *Lawrence* majority exposed itself to Justice Scalia's apocalyptic rhetoric (although to be fair, Justice Scalia does not spare Justice O'Connor a ration of the same rhetoric) predicting the inevitable extension of constitutional protection to a multitude of cultural taboos, including polygamy, that have been targeted for criminal sanction. *Id.* at 586, 123 S.Ct. 2472. The Chief Justice's reliance on *Lawrence* appears to validate what would appear to most as Justice Scalia's far-fetched concerns.

¶ 128 I believe that *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879), blocks any ambitions that *Lawrence* might have to seize polygamy and draw the practice of plural marriage within the protection of the Constitution. I am simply unable to extract from either the text or the context of *Reynolds* any evidence to support the Chief Justice's contention that we may sidestep its holding because it appears to us that polygamy no longer presents a social danger or that the Court's expression of belief that it posed such a danger in 1879 was merely an ill-

informed and mean-spirited bias against the LDS Church.

¶ 129 The precedent of *Reynolds* standing alone is sufficient to insulate Utah's bigamy statute from attack under the United States Constitution. I comment on the additional justifications advanced in the majority opinion for the statute's constitutionality only to note my view that they should not be read to suggest that the State has sweeping authority to regulate intimate personal relationships. Intimate personal relationships may indeed "serve as the building blocks of our society." It would be a mistake, however, to read into this observation any intention to enable the State to act as social engineer and architect, empowered to outlaw societal building blocks that do not conform to its preferred design or assembly. In this respect, polygamy and, since the adoption of article I, section 29, the Utah constitutional prohibition against legal unions between persons of the same gender, stand apart as realms in which the State may have sufficient justification to regulate intimate relationships. In neither of these instances, however, does that justification derive from the ability of the State to demonstrate that a compelling state interest is served by its intervention into intimate relationships. Rather, the authority of the State to criminalize polygamy and to deny legal status to same gender unions is tied directly to constitutional grants of authority and, in the case of polygamy, United States Supreme Court precedent.

¶ 130 I continue to be troubled by the concern that animated Chief Justice Durham's concurring opinion in *Green* over the potential use of Utah's unsolemnized marriage statute, section 30-1-4.5, to create a predicate for the bigamy prosecution of persons who seek no legal validation of a union based solely on a private pledge. Justice Durrant straddles this issue by, on the one hand, agreeing with the Chief Justice's statement that any two people may make private pledges that do not receive legal recognition as marriage while, on the other hand, noting the existence of the unsolemnized marriage statute and the existence of a substantial state interest in criminalizing unions when

there is an "existing marriage," presumably including a marriage created by operation of the unsolemnized marriage statute. Because the existence of a solemnized marriage is undisputed here, it is entirely in order to straddle this question. I suspect, however, that at some point we will be called upon to confront this question and put both feet on one side or the other.

DURHAM, Chief Justice, concurring in part and dissenting in part:

¶ 131 I join the majority in upholding Holm's conviction for unlawful sexual conduct with a minor. As to the remainder of its analysis, I respectfully dissent. As interpreted by the majority, Utah Code section 76-7-101 defines "marriage" as acts undertaken for religious purposes that do not meet any other legal standard for marriage—acts that are unlicensed, unsolemnized by any civil authority, acts that are indeed entirely outside the civil law, and unrecognized as marriage for any other purpose by the state—and criminalizes those acts as "bigamy." I believe that in doing so the statute oversteps lines protecting the free exercise of religion and the privacy of intimate, personal relationships between consenting adults.

¶ 132 The majority upholds Holm's criminal bigamy conviction based solely on his participation in a private religious ceremony because the form of that ceremony—though not its intent—resembled what we think of as a wedding, a ritual that serves to solemnize lawful marriages and in which the parties formally undertake the legal rights, obligations, and duties that belong to that state-approved institution. In resting its conclusion on that basis, the majority, in my view, ignores the legislature's intent that the concept of marriage in Utah law be confined to a legally recognized union. I also believe that the majority's reasoning fails to distinguish between conduct that has public import of a sort that the state may legitimately regulate and conduct of the most private nature.

¶ 133 In particular, the majority broadly interprets the "purports to marry" prong of Utah's bigamy statute, Utah Code Ann. § 76-7-101 (2003), to include the purported entry into "marriages recognized both by law

and by custom." *Supra* ¶ 25. The majority then implicitly concludes that the term "marriage" in article III, section 1 of the Utah Constitution, which declares that "polygamous and plural marriages are forever prohibited," has the same broad meaning and, thus, that the Utah Constitution excludes even private polygamous relationships from the scope of its protections of religious freedom and individual liberty. *Supra* ¶ 47. The majority further holds that the United States Constitution's protection of individual liberty under the Fourteenth Amendment's Due Process Clause does not extend to "the type of polygamous behavior at issue in this case," *supra* ¶ 53, not only because that behavior involves a minor but also because it "implicates the public institution of marriage," *supra* ¶ 56.

¶ 134 On all three points, I believe that the majority's expansive conception of marriage in Utah law is the result of a flawed analysis with problematic implications. Because I do not agree that the state can constitutionally criminalize private religiously motivated consensual relationships between adults, I believe Holm's conviction under section 76–7–101—which does *not* rely on the fact that Holm's partner in his alleged bigamy was a minor—must be overturned, and I therefore respectfully dissent from Part I of the majority's opinion. I explain my disagreement with the majority's reasoning below, first addressing its interpretation of the "purports to marry" prong of section 76–7–101. I then address its analysis of Holm's constitutional challenges to the bigamy statute and offer an alternative reading of our state constitution's polygamy and religious freedom provisions and of *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

## I. INTERPRETATION OF "PURPORTS TO MARRY" IN SECTION 76–7–101

¶ 135 The majority concludes that Holm may be found guilty of "purport[ing] to marry another person" while already having a wife because he entered a religious union with Ruth Stubbs that the two of them referred to as a "marriage," even though neither believed, represented, or intended that the union would have the legal status of a state-sanctioned marriage.[1] In doing so, the majority deems irrelevant the distinction between the word "marry" when used in a legal context and the same word's idiosyncratic meaning when used as a label for a relationship recognized as significant by a particular individual or group, but not by the state.

¶ 136 This view is first evident in the majority's preference for the definition of "marry" that appears in *Merriam–Webster's Collegiate Dictionary* rather than the definition that appears in *Black's Law Dictionary.* The former work acknowledges the reality that individuals may use the term "marry" to refer to a union formed "according to law or custom." *Merriam–Webster's Collegiate*

---

1. The evidence at trial was undisputed on the latter point. On cross-examination, Ruth Stubbs engaged in the following exchange with Holm's attorney:

 [Holm's attorney]. Did, did this marriage in your mind was it a, a civil, a legal civil marriage under the laws of the, of the government?
 [Ruth]. No.
 Q. You knew that it was not a, a marriage that would be recognized by the law. Right?
 A. Right.
 Q. Nevertheless, a, did you believe that you were married?
 A. Yes.
 Q. You believed you were married in a religious sense?
 A. Yes.
 . . . .
 Q. You were married in a religious ceremony. Correct?
 A. Correct.
 Q. And, and people in the community knew you had been married in a religious ceremony. Is that right?
 A. Right.
 Q. Did you ever tell people that you were legally married to Rod?
 A. No.
 Q. Did you ever hold yourself out to anyone, even outside of the community, as being legally married to Rod?
 A. No.
 Ruth further affirmed, upon questioning, that she was familiar with the basis for "the idea of plural marriage," and that both she and Holm believed "that plural marriage was a commandment of God."
 During his deposition, parts of which were read into the trial record by the State prosecutor, Holm testified that he had never submitted forms to any governmental agency representing that he was married to Ruth Stubbs. Holm further testified that he was not legally married to Ruth.

*Dictionary* 761 (11th ed.2003) (emphasis added). In contrast, the latter, concerned as it is with what words mean when they are vested with legal import, defines "marriage" as "[t]he *legal union* of a couple as husband and wife." *Black's Law Dictionary* 992 (8th ed.2004) (emphasis added).[2]

¶ 137 I do not believe it is appropriate to interpret the term "marry" when it appears in a state statute as providing what is essentially an anthropological description of human relationships. To do so is to ignore the fact that the law of our state and our nation has traditionally viewed marriage as denoting a legal status as well as a private bond.[3]

¶ 138 I also do not believe that the legislature, having so carefully structured the various prerequisites of marriage in state law, as well as the rights, duties, and obligations that state law accords married persons, would use the term "marry" in section 76–7–101, alone among all statutory provisions, to mean not only entry into a legally recognized marriage but also entry into any relationship that is accepted as marriage in whatever custom or tradition the parties consider applicable.[4]

2. The majority argues that *Black's Law Dictionary* does not confine its definition of the term "marriage" to a "legal union," pointing out that *Black's* also defines "plural marriage," "bigamy," and "polygamy" as types of "marriage." *Supra* ¶ 19. The majority concludes that if the word "marry" in a legal context referred only to legally recognized marriages, "these definitions would be nonsensical, as one could not 'marry' another while legally married." *Supra* ¶ 19. It is a mistake, however, to understand *Black's* as presuming a particular legal status quo. Theoretically, it would be possible for a state to recognize plural unions as legally valid, and thus plural "marriages" in a legal sense. Indeed, as discussed below, the territory that became Utah at one time recognized plural marriages as legally valid. Furthermore, I believe the term "marriage" in the definitions of "putative marriage," "clandestine marriage," and "void marriage," quoted by the majority, *supra* ¶ 20, could accurately be replaced by the phrase "legal union."

3. *See Maynard v. Hill*, 125 U.S. 190, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888) ("When the contracting parties have entered into the married state, they have not so much entered into a contract as into a new relation, the rights, duties, and obligations of which rest not upon their agreement, but upon the general law of the State, statutory or common, which defines and prescribes those rights, duties, and obligations. They are of law, not contract." (internal quotation omitted)); *Pennoyer v. Neff*, 95 U.S. 714, 734–35, 24 L.Ed. 565 (1878) ("The jurisdiction which every State possesses to determine the civil *status* and capacities of all its inhabitants ... [includes the] absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved."); *accord Universal Life Church v. Utah*, 189 F.Supp.2d 1302, 1315 (D.Utah 2002) (recognizing that "marriage is a state-conferred legal status" (internal quotation omitted)); *Riddle v. Riddle*, 26 Utah 268, 72 P. 1081, 1084 (1903) ("The legal status of marriage rests solely upon the basis of a civil contract, in which the contracting parties mutually consent and agree to be bound by the 'various obligations and liabilities' which by operation of law arise from the relations of the contracting parties upon the consummation of the marriage."); *cf. Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶¶ 23, 27, 325 Mont. 148, 104 P.3d 445 (concluding that the fact that a university benefits policy allowed "unmarried opposite-sex couples" to sign an affidavit that they were "married" for purposes of receiving benefits defeated the university's claim that benefits were based on marital status because "marital status" depends on compliance with legal rules, not an affidavit).

4. The separate concurrence questions the connection between the Utah Code's "[d]escribing the characteristics of those who may legally marry" in Title 30, Chapter 1, and "defining and proscribing" bigamy in section 76–7–10. *Supra* ¶ 115. It also contends that the language of section 30–1–2 recognizes certain relationships as "marriages" even as it declares such "marriages" prohibited and void. *Supra* ¶ 116. In my view, the purpose of section 76–7–10 is to impose criminal penalties on those who purport to enter a legal union that is in fact void under section 30–1–2(1). I understand the declaration in section 30–1–2, that certain "marriages" are prohibited and void, to mean that any attempt by those described to enter into a legal union in fact results only in a purported marriage. The contrary reading suggested in the concurrence simply leads to the perplexing question, in what sense can the state legislature prohibit and declare void a relationship that does not claim any legal status? The majority attempts to bolster the logic of its position by pointing to definitions of bigamy that refer to "marrying" one person while being legally married to another. *Supra* ¶ 22 n. 6. The majority concludes that such definitions are "nonsensical if the term 'marry' is considered limited to legally recognized marriage." *Supra* ¶ 22 n. 6. In my view, the majority too easily discounts the possibility that such definitions were simply inartfully drafted. I suspect that our legislature in fact recognized that such definitions made no logical sense, and this is why section 76–7–101 criminalizes "purport[ing] to marry," rather than "marrying," one person while legally married to another. Significantly,

Beyond *Merriam–Webster's*, the only authorities cited by the majority are Utah's unsolemnized marriage statute, Utah Code Ann. § 30–1–4.5 (1998 & Supp.2005), and the "cohabits" prong of Utah Code section 76–7–101. However, Utah Code section 30–1–4.5, which provides an adjudicatory alternative to statutory licensing and solemnization requirements, itself demonstrates that only legally recognized, licensed marriages are marriages under Utah law; so-called "common law marriages" have not been recognized in Utah since statehood.[5]

¶ 139 As for the "cohabits" prong of section 76–7–101, the majority fails to explain why the breadth of that provision should conclusively determine our interpretation of the parallel "purports to marry" prong. I perceive no justification for judicial speculation that the legislature intended a uniquely "expansive definition" of "marry" in section 76–7–101, *see supra* ¶ 22, especially given the legislature's express statement to the contrary in another Utah Code provision, section 30–1–4.1 (Supp.2005). That provision explains that Utah "recognize[s] as marriage only the legal union of a man and a woman as provided in this chapter." Utah Code Ann. § 30–1–4.1(1)(a); *see also* Utah Const. art. I, § 29 ("Marriage consists only of the legal union between a man and a woman."). As a matter of simple grammatical extrapolation, if only a "legal union of a man and a woman" is "marriage," then "purporting to marry," must be purporting to enter into such a legal union.[6]

¶ 140 The majority also refers to "the well-documented history of this State's attempts to prevent the formation of polygamous unions" as evidence that section 76–7–101 was intended to criminalize "attempts to form duplicative marital relationships that are not legally recognized." *Supra* ¶ 26. This invocation of legislative history seems somewhat ironic in light of this court's recent refusal to consider the same history in analyzing

---

this court has commonly used the phrase "purported marriage" to mean a marriage that was represented as legally valid by at least one party, but that in fact was void under state law. *See, e.g., Kent v. Kent*, 28 Utah 2d 34, 497 P.2d 652, 653 (1972) (describing as a "purported marriage" the plaintiff's union with a man who was "unable to contract a valid marriage" because he was married to someone else); *Buck v. Buck*, 19 Utah 2d 161, 427 P.2d 954, 955 (1967) (describing as a "purported marriage" a "union" that was "legally invalid" because the man's divorce was not yet final); *Thomas v. Children's Aid Soc'y*, 12 Utah 2d 235, 364 P.2d 1029, 1031 (1961) (describing as a "purported marriage" a marriage that was "void ab initio" because one of the parties was already married); *Cecil v. Cecil*, 11 Utah 2d 155, 356 P.2d 279, 280–81 (1960) (describing as a "purported marriage" a marriage that was legally invalid because one party was judged incompetent); *Popp v. Roth*, 9 Utah 2d 96, 338 P.2d 123, 124 (1959) (stating that a man who "purportedly married" a woman when he was already married did not "enter into a valid marriage"); *In re Vetas' Estate*, 110 Utah 187, 170 P.2d 183, 184 (1946) (describing as a "purported marriage" a marriage that was not "solemnized as required by our statutes," and was thus void); *Jenkins v. Jenkins*, 107 Utah 239, 153 P.2d 262, 263 (1944) (describing as a "purported marriage" a marriage that was void under the law because one party's divorce was not final when the marriage occurred); *In re Waters' Estate*, 100 Utah 246, 113 P.2d 1038, 1039 (1941) (describing as a "purported marriage" a marriage that was void because one party's prior divorce had not been valid); *Sharp v. Seventh*

*Judicial Dist. Court*, 81 Utah 236, 17 P.2d 261, 262–63 (1932) (describing as a "purported marriage" a marriage that was void under the law as it then existed because one party suffered from epilepsy and syphilis).

5. Under Utah law, it is the intent to legally marry, not the intent to enter into a personal relationship, that is significant for purposes of section 30–1–4.5 (1997 & Supp. 2005). *See In re Marriage of Gonzalez*, 2000 UT 28, ¶ 25, 1 P.3d 1074 (recognizing that the one-year statute of limitations in section 30–1–4.5 is meant to "protect parties who never meant to be *statutorily married* from adjudications [of marriage] many years after their relationship has ended" (emphasis added)); *Beck v. Utah–Idaho Sugar Co.*, 59 Utah 314, 203 P. 647, 650 (1921) (distinguishing an individual's intent that women be his "plural wives" under LDS Church doctrine from an intent that any of them be his "legal wife"); *Riddle*, 72 P. at 1085 (holding that "the legal status of marriage cannot arise" without a mutual agreement "to assume and observe the legal obligations of that relation").

6. The majority refutes this argument by suggesting that this language merely imposes "a limit [on] the types of marriages that can be legally recognized in Utah," rather than providing "a definition of marriage." *Supra* ¶ 39. The majority perceives a distinction here based on its prior conclusion that "marriage" in Utah law can include relationships not recognized as "marriage" under Utah law. When this logic is distilled, it seems to me rather circular.

whether section 76–7–101 impermissibly targeted religiously motivated practices. *See State v. Green*, 2004 UT 76, ¶¶ 24–25, 99 P.3d 820. Moreover, as far as I am aware, the "well-documented history" to which the majority refers ended long before 1973, when section 76–7–101 was originally enacted. *State v. Tuttle*, 730 P.2d 630, 632 (Utah 1986) (recognizing that in 1973 our legislature "repealed wholesale all the prior substantive criminal statutes ... and enacted a sweeping new penal code that departed sharply from the old common law concepts"). The majority fails to explain how that history could be relevant to our interpretation of section 76–7–101.

¶ 141 The majority adopts the position that "an unlicensed, solemnized marriage can serve as a subsequent marriage that violates the bigamy statute." *Supra* ¶ 26. The majority then concludes that Holm entered such a "solemnized marriage" with Ruth Stubbs by participating in an FLDS ceremony in which (1) a religious leader officiated, (2) "vows typical of a traditional marriage ceremony" were exchanged, and (3) the woman wore a white dress. *Supra* ¶ 30. This position conflates "solemnization" with participation in a ritual of union specific to one's customs or religious beliefs.

¶ 142 The majority defines "solemnization" as "the steps, whether ritualistic or not, by which two individuals commit themselves to undertake a marital relationship." *Supra* ¶ 32. A more accurate conception of the term, however, recognizes "solemnization" as the formal undertaking, before witnesses, of the legal obligations of marriage. *See Maynard v. Hill*, 125 U.S. 190, 210–11, 8 S.Ct. 723, 31 L.Ed. 654 (1888) ("[M]arriage ... does not require any religious ceremony for its solemnization.... [W]hen the contract to marry is executed by the marriage's [solemnization], a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities."); *accord Hernandez v. Robles*, 7 Misc.3d 459, 794 N.Y.S.2d 579, 588 (Sup.Ct.

2005); *cf. Black's Law Dictionary* (8th ed.2004) (defining solemnization as "[t]he performance of a formal ceremony (such as a marriage ceremony) before witnesses"). The parties' intent to assume these legal obligations is what distinguishes a ceremony properly considered a "solemnization" from one that is merely a private religious ritual.

¶ 143 Had Holm and Ruth Stubbs intended to marry under state law and to assume the concomitant legal obligations, a sealing ceremony of the type in which they participated would satisfy the state's solemnization requirement, assuming that all other requirements, such as licensure, were met. *See* Utah Code Ann. § 30–1–6 (Supp.2004); *cf. Hilton v. Roylance*, 25 Utah 129, 69 P. 660, 670 (1902) (holding that a sealing ceremony performed by an LDS Church official in 1872 effected a marriage cognizable at common law). This fact indicates an accommodation by state law of the personal preferences of individuals regarding the context in which marriage solemnization occurs. Members of a particular religion may combine solemnization with the ritual of union traditionally practiced within their faith. Thus, under the relevant Utah Code section, marriages may be solemnized by "ministers, rabbis, or priests of any religious denomination who are (i) in regular communion with any religious society; and (ii) 18 years of age or older," Utah Code Ann. § 30–1–6(1)(a), as well as by "Native American spiritual advisors." *Id.* § 30–1–6(1)(b).

¶ 144 It does not follow, however, that every ceremony performed by one of these individuals, who are not public officials, that is designed to unite two individuals in some way meaningful within a particular religion constitutes "solemnization" whenever it is "indistinguishable from a [typical] marriage ceremony." *Supra* ¶ 30. The majority's interpretation will subject religious leaders to criminal sanction for performing religious ceremonies that are not intended by anyone involved to have significance beyond the community in which they occur. *See* Utah Code Ann. § 30–1–15 (imposing criminal penalties on the solemnization of marriages prohibited by state law). For example, a minister officiating in a commitment ceremony involving a

same-sex couple may now be held in violation of section 30–1–15(2) (though perhaps only if at least one partner is wearing a white dress). Such a result turns the purpose of Utah Code section 30–1–6 on its head. *Cf. In re Estate of Litzky,* 296 So.2d 638, 639 (Fla.Dist.Ct.App.1974) (recognizing that the union of a couple for whom an Orthodox Jewish rabbi had performed a religious ceremony was equivalent to a common law marriage, which involves no solemnization, where no marriage license had been obtained).

¶ 145 The majority claims that "[t]he crux of marriage in our society, perhaps especially a religious marriage, is not so much the license as the solemnization," and that "[t]he presence or absence of a state license does not alter th[e] [marital] bond or the gravity of the commitments made by Holm and Stubbs." *Supra* ¶ 32. It is apparent that the majority wishes to emphasize the importance of the private commitment between two partners who pledge to each other lifelong love, companionship, and support. The majority also alludes to the sanctification such a commitment receives when the partners participate in a religious ceremony in accord with their faith. Undoubtedly, a couple may feel it is their commitment before God that gives their relationship its legitimacy or permanence. However, it is beyond dispute that such private commitments alone, even when made before God, do not constitute "marriage" in our state or in our legal system. Any two people can make private pledges to each other, with or without the assistance of a religious official, but these private commitments are not equivalent to marriage absent a license or an adjudication of marriage. Likewise, such commitments are not enforceable under state law unless additional steps are taken to set forth mutual obligations in a written contract. Rather,

despite the majority's assertion, a state license does indeed alter the bond between two people, and the gravity of their commitments, by making the state a third party to the relationship. *See Palmer v. Palmer,* 26 Utah 31, 72 P. 3, 7–8 (1903) (recognizing that "[m]arriage differs from ordinary contracts" in that "the State, to every marriage contract entered into within its jurisdiction, makes itself a party" (internal quotation omitted)). When a marriage occurs, no separate contract is needed in order for marital rights and duties to be enforceable; rather, the parties' private commitments are overlaid by a comprehensive legal framework set forth, in part, in a state's statutory law.[7]

¶ 146 The majority points to the fact that Holm and Stubbs referred to themselves as "married" in a religious sense as further evidence that they "purport[ed] to marry" within the meaning of section 76–7–101. However, the law has no monopoly on particular language. In my view, those who choose, for religious or other personal reasons, to refer to themselves as "married," even though they know the law does not so regard them, are free to do so within their private sphere and cannot by that act alone fall subject to criminal penalties. Imposing criminal penalties on such a basis is equivalent to disciplining an individual who goes by the name of "Doctor W," but who is not, in fact, a licensed physician, for violation of state licensing requirements even though he has never professed to be a legally licensed doctor or to have the medical expertise which that status is designed to ensure.

¶ 147 I therefore interpret the "purports to marry" prong of section 76–7–101 as referring to an individual's claim of entry into a legal union recognized by the state as marriage. The phrase does not encompass an individual's entry into a religious union

7. The General Accounting Office estimates that there are 1,138 federal statutory provisions "in which benefits, rights, and privileges are contingent on marital status" in areas including taxation, social security, housing and food stamp programs, immigration, and employment benefits. U.S. Gen. Accounting Office, Report No. GAO–04–353R, Defense of Marriage Act: Update to Prior Report 1 (2004), *available at* http://www.gao.gov; U.S. Gen. Accounting Office, Report No. OGC–97–16, Defense of Marriage Act 1–

3 (1997), *available at* http://www.gao.gov. Areas of state law in which marital status is a factor include, for example, insurance coverage, Utah Code Ann. §§ 31A–22–305, –307 (2005), employment benefits, *id.* §§ 34A–2–403 (2005), 49–13–405 (2002 & Supp.2005), real estate conveyances, *id.* § 57–1–5 (2000 & Supp.2005), inheritance, *id.* § 75–2–102 (1993 & Supp.2005), and wrongful death recovery, *id.* §§ 78–11–6.5, –7 (2002 & Supp.2005).

where there has been no attempt to elicit the state's recognition of marital status or to procure the attendant benefits of this status under the law, and where neither party to the union believed it to have legal import. I therefore believe it was error for the district court to submit to the jury the question of Holm's guilt under that prong of section 76–7–101.

¶ 148 I next address the majority's treatment of Holm's state and federal constitutional claims and explain why I consider Holm's conviction for engaging in private religiously motivated conduct unconstitutional.[8]

## II. STATE CONSTITUTIONAL CLAIMS

### A. Interpretation of Article III, Section 1

¶ 149 The majority's conflation of private relationships with legal unions is also problematic in its analysis of Holm's claim that his bigamy conviction violates the guarantees of individual rights protected by article I of the Utah Constitution. The majority dismisses Holm's claim on the basis that the Utah Constitution "offers no protection to polygamous *behavior* and, in fact, shows antipathy towards it by expressly prohibiting such *behavior*" in article III, section 1. *Supra* ¶ 36 (emphasis added). However, that provision declares that "polygamous or plural *marriages* are forever prohibited." Utah Const. art. III, § 1 (emphasis added). Here, as elsewhere in Utah law, I understand the term "marriage" to refer only to a "legal union." *See, e.g.,* Utah Const. art. I, § 29(1) ("Marriage consists only of a legal union between a man and a woman."). Understood in this way, article III, section 1, by its plain language, does not prohibit private individual behavior but instead prevents Utah's state government, to whom the ordinance is addressed, from recognizing a particular form of union as a "marriage."

¶ 150 The majority concludes that article III, section 1 is a restriction on individual rights rather than on state government. It justifies this conclusion primarily by reference to the proceedings of Utah's 1895 constitutional convention, which reflect the drafters' concern with following the federal requirements set forth in the Utah Enabling Act, ch. 138, 28 Stat. 107 (1894). Specifically, the majority emphasizes some delegates' concern that the federal government intended, through the Enabling Act, not only to prevent Utah from recognizing polygamous unions as valid marriages, but also to require that the state impose criminal penalties on polygamy. However, the majority's own analysis makes it clear that the drafters did not address this concern by revising article III, section 1; rather, they simply reaffirmed the validity of a territorial statute. *See* Utah Const. art. XXIV, § 2 (declaring in force an 1892 law "in so far as the same defines and imposes penalties for polygamy"). Moreover, that statute criminalized only polygamous *marriage,* not polygamous *behavior.*[9]

8. Were I writing the court's opinion, having concluded that Holm's conviction under the "purports to marry" prong was incorrect as a matter of statutory interpretation, my further analysis would be limited to the constitutionality of the alternative "cohabits" prong. However, unless specifically indicated, the analysis below is addressed equally to Holm's conviction under the "cohabits" prong and the "purports to marry" prong, as the latter has been interpreted by the majority to apply to private religiously motivated conduct.

9. I acknowledge that, at that time, there may have been little distinction between the two. Because common law marriage was recognized in Utah until 1898, 29 Utah Rev. Stat. ch. 1, § 1189 (1898), the entry into a polygamous union could be taken as the purported entry into the legal status of marriage. *See Reynolds v. United States,* 98 U.S. 145, 161, 25 L.Ed. 244 (1878) (affirming a conviction for bigamy based upon the defendant's participation in a religious ceremony); *Hilton v. Roylance,* 25 Utah 129, 69 P. 660, 670 (1902) (holding that participation in a religious ceremony was sufficient to establish a marriage cognizable at common law). There was no argument in *Reynolds* that the defendant did not intend his polygamous union to have legal effect; to the contrary, he argued that polygamous unions were entitled to legal effect under the First Amendment's Free Exercise Clause. *See Reynolds,* 98 U.S. at 161–62; Sarah Barringer Gordon, *The Mormon Question: Polygamy and Constitutional Conflict in Nineteenth Century America* 119–45 (2002) [hereinafter Gordon, *The Mormon Question*] (discussing *Reynolds*). Moreover, as discussed below, it was against the backdrop of such unions receiving legal recognition in the territory under the control of the LDS Church that the Morrill Act criminalized polygamous marriage.

1892 Utah Laws ch. VII, § 1, at 5–6 (defining "polygamy" as "ha[ving] a husband or wife living" and "marr[ying] another," or as "marr[ying] more than one woman" on the same day). The majority reasons that because the drafters thought it necessary to affirm the criminalization of polygamous marriage in article XXIV, they must therefore have intended the reference to polygamous marriage in article III, section 1 to place all private polygamous relationships outside constitutional protection.

¶ 151 My review of the history of Utah's statehood leads me to conclude otherwise, and further bolsters my understanding of the term "marriage" in article III, section 1. I read both the Enabling Act and the ordinance provisions, to the extent the latter can be identified with the former,[10] as carrying forward a restriction that Congress had placed on Utah's territorial government beginning with the Morrill Act, 12 Stat. 501 (1862). That statute provided that " 'all . . . acts and parts of acts heretofore passed by the said legislative assembly of the Territory of Utah, which establish, support, maintain, shield or countenance polygamy, be, and the same hereby are, disapproved and annulled.' " *Cope v. Cope*, 137 U.S. 682, 686, 11 S.Ct. 222, 34 L.Ed. 832 (1891) (quoting Morrill Act, ch. 126, § 2, 12 Stat. 501); *see In re*

*Handley,* 7 Utah 49, 24 P. 673, 674–75 (1890) (citing Morrill Act). Among the "acts" to which the Morrill Act referred was undoubtedly the law incorporating the LDS Church, passed in 1851 by the Provisional State Government of the proposed State of Deseret. This law had granted the LDS Church full authority to conduct marriages of its members in accord with Church doctrine.[11] When Deseret's 1850 petition for statehood was denied and a territorial government was established instead, the territorial legislature revalidated the laws enacted by the provisional government. Dale L. Morgan, *The State of Deseret* 88 (1987) (citing 1852 Utah Laws 222, an October 4, 1851 joint resolution of the territorial legislature). Thus, after 1852, when the Church publicly recognized the doctrine of plural marriage, ceremonies of plural union performed according to Church practice were legally valid marriages under territorial law until the Morrill Act declared otherwise. This history demonstrates that the legal status of polygamous unions was a matter of concern. Accordingly, the language prohibiting plural or polygamous "marriage" in the Enabling Act and Ordinance provisions was likely intended to preclude the reenactment of laws granting polygamous unions legal recognition once Utah achieved statehood.[12]

10. Both the majority and the concurrence assume that the framers of our constitution had an intent identical to that of Congress in regard to the purpose and meaning of the ordinance provision. Congress's intent, however, may be beside the point. As the majority acknowledges, the intent of the framers in complying with this mandate was to gain statehood. Taking that fact into account leads me to view the framers' inclusion of the polygamy provision in our constitution, and their discussion self-consciously preserved in the Proceedings, as to some extent a command performance, with Congress and the rest of the country as the intended audience. The Proceedings excerpts quoted by the majority must be understood with that immediate concern in mind, and what they reveal about how the framers believed the provision would operate after Utah became a state deserves more careful consideration.

11. The law provided that, "as said church holds the constitutional and original right, in common with all civil and religious communities, 'to worship God according to the dictates of conscience;' . . . [the LDS Church may] solemnize marriage compatible with the revelations of Je-

sus Christ," and granted the church "the power and authority" to make laws relating to marriage as long as these laws were based on doctrines that "support virtue, and increase morality, and are not inconsistent with, or repugnant to, the Constitution of the United States, or of this State, and are founded in the revelations of the Lord." An Ordinance, Incorporating the Church of Jesus Christ of Latter-day Saints § 3 (passed Feb. 4, 1851), *reprinted in* Dale L. Morgan, *The State of Deseret* 186 (1987); *see also* Morgan, *supra*, at 61 (concluding that "the concept of polygamy, not yet avowed by the church, seems [in this law to have been] considered").

12. I am aware that a plurality of this court in *In re Interest of Black*, 3 Utah 2d 315, 283 P.2d 887 (1955) (plurality opinion), interpreted the Ordinance provision differently. *Id.* at 905 (stating that through this provision, "the framers of our Constitution wished to make clear that polygamy was not included within an approved mode of religious worship" and that restrictions on the practice of polygamy could not implicate article I's religious freedom guarantees). However, the plurality's observation, made in dicta, does not constitute precedent binding on this court, and

¶ 152 The above discussion illustrates that when the term "marriage" in the Ordinance provision is understood, as I believe it must be, as denoting a legal status, the meaning of the provision is plain and in accord with territorial history. It could then be argued that the provision establishes that, as a matter of constitutional law, the state's refusal to recognize polygamous unions as legal marriages may not be construed as discriminatory treatment of those who engage in such unions as a matter of religious practice. However, this case does not present that issue since, as discussed above, Holm has made no claim to legal recognition.

¶ 153 Additional history, far from demonstrating the drafters' intent to exclude particular private behavior from access to constitutional protections, raises the possibility that the drafters anticipated some relief from governmental interference for those relationships already in existence. In addition to the provision criminalizing polygamous marriage, quoted above, the 1892 Act contained a separate provision criminalizing unlawful cohabitation, which it defined as "any male person . . . cohabit[ing] with more than one woman." *Id.* § 2, 1892 Utah Laws at 6. Yet, the unlawful cohabitation provision, unlike the polygamy provision, was not specifically mentioned in article XXIV, section 2. The unlawful cohabitation provision was therefore subject to the general statement in article XXIV, section 2 that "[a]ll laws of the Territory of Utah now in force, *not repugnant to this Constitution*, shall remain in force until they expire by their own limitations, or are altered or repealed by the Legislature." Utah Const. art. XXIV, § 2 (emphasis added). Accordingly, that provision would remain valid only if the state courts did not deem it unconstitutional, and only as long as the legislature kept it in effect. It is not inconceiva-

ble that the drafters, while conceding that polygamous unions could never receive legal recognition, believed that private polygamous practice, including cohabitation with former "wives" and their children, might continue.[13]

¶ 154 I therefore conclude that neither article III, section 1 nor article XXIV, section 2 categorically excludes private polygamous conduct from any possibility of protection under article I. I thus disagree that the court can so easily avoid the constitutional challenges Holm raises. My further discussion of Holm's state constitutional claims is limited to whether, in my view, his bigamy conviction violates our constitution's religious freedom guarantees. Because I conclude that it does, I need not consider additional state constitutional arguments.

### B. Religious Freedom Claim

¶ 155 Holm essentially argues that the State may not subject him to a criminal penalty under a generally applicable criminal law for his religiously motivated practice of polygamy because imposing that penalty is inconsistent with our constitution's protection of religious freedom. The State does not dispute the sincerity of Holm's religious motivation, and given Holm's established membership in the FLDS community, there appears to be no reason to doubt Holm's assertion that polygamy is a central tenet of his religion. Resolution of this issue therefore turns on the interpretation of the religious freedom guarantees found in the Utah Constitution.

¶ 156 As an initial matter, I accept the premise that our state constitution's guarantee of religious freedom encompasses religiously motivated conduct as well as belief. *See, e.g.,* Utah Const. art. I, § 1 (recognizing right "to worship"); *id.* art. I, § 4 (guaran-

its opinion makes no mention of the history I have just described. I am convinced, based on my own study of this issue, that the plurality's interpretation is incorrect.

**13.** The "cohabits" prong of the current criminal bigamy statute, Utah Code section 76–7–101(1), extends the definition of polygamy beyond that contained in the 1892 Act by incorporating, to a certain extent, the 1892 concept of unlawful cohabitation. Whereas under the 1892 Act a person would be guilty of polygamy only if he pur-

ported to marry two individuals at once, under section 76–7–101(1) a person is guilty of bigamy if he cohabits with one individual while married to another. *See* Utah Code Ann. § 76–7–101(1). Thus, even if article XXIV, section 2 were interpreted as imposing a constitutional requirement that polygamy, as defined in the 1892 Act, be criminalized, such a conclusion would have no bearing on the constitutionality of the "cohabits" prong of the current criminal bigamy statute.

teeing "free exercise" of religion); *see also* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L.Rev. 1409, 1459–60 (1990) [hereinafter McConnell, *Origins* ] (concluding that the terms "exercise" and "worship" in late eighteenth century state constitutions both denoted conduct, though the term "worship" is usually limited to ritual or ceremonial acts). Thus, Holm's conduct—cohabiting with Ruth Stubbs after participating in a religious ceremony with her while legally married to another woman—qualifies as religious "exercise" within the meaning of article I, section 4.

¶ 157 The question remains whether, and under what circumstances, our constitution requires an exemption from generally applicable criminal laws. This court held in *State v. Green*, 2004 UT 76, ¶ 37, 99 P.3d 820, that no such exemption was required under the federal constitution's Free Exercise Clause. However, as the majority states, "We have never determined whether the free exercise clause of article I, section 4 [and the other related clauses] of the Utah Constitution provide[ ] protection over and above that provided by the First Amendment to the United States Constitution." *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998). I believe that governmental burdens on religiously motivated conduct should be subject to heightened scrutiny, a proposition that a number of my colleagues, past and present, have also previously endorsed. *See Green*, 2004 UT 76, ¶ 70, 99 P.3d 820 (Durrant, J., concurring); *see also Wood v. Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶ 43 n. 1, 67 P.3d 436 (Durham, C.J., dissenting) (recognizing that this court employed heightened scrutiny when conducting an article I, section 4 analysis in *Soc'y of Separationists v. Whitehead*, 870 P.2d 916 (Utah 1993)).

¶ 158 In reaching the conclusion that the framers of our state constitution intended such an analysis, I look first to the United States Supreme Court's decision in *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1879). In light of the fact that *Reynolds* was issued in 1879, seventeen years before the 1896 ratification of our state constitution, and the fact that the underlying controversy

in *Reynolds* originated in the Utah territory, it would be disingenuous to assert that the Court's interpretation of free exercise in *Reynolds* did not inform the understanding of the framers when they inserted an identically phrased clause in article I, section 4 of the Utah Constitution. The Court has subsequently interpreted *Reynolds* as "reject[ing] the claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice." *Employment Div. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). However, I disagree that *Reynolds'* reasoning entirely foreclosed religion-based exemptions from criminal laws.

¶ 159 The *Reynolds* Court framed the issue under consideration as follows: "whether religious belief can be accepted as a justification of an overt act made criminal by the law of the land." 98 U.S. at 162. In analyzing this issue, the Court relied on Thomas Jefferson's formulations "almost as an authoritative declaration of the scope and effect" of the Free Exercise Clause. *Id.* at 164. The Court first quoted the 1786 Virginia Bill for Establishing Religious Freedom, drafted by Jefferson, indicating that religious freedom extends only until "principles break out into overt acts against peace and good order." *Id.* at 163 (internal quotation omitted). It then quoted Jefferson's 1802 letter to the Danbury Baptist Association, in which he stated that man "has no natural right in opposition to his social duties." *Id.* at 164 (internal quotation omitted). Summarizing these statements, the Court concluded that Congress was free, consistent with the Free Exercise Clause, "to reach actions which were in violation of social duties or subversive of good order." *Id.*

¶ 160 The Court then analyzed whether the practice of polygamy or polygamous marriage was in violation of social duties or subversive of good order. It determined that polygamy was indeed an "offence against society," and that punishing polygamy was therefore within Congress's legislative power. *Id.* at 165–66. Finally, reaching the question of religion-based exemption, the Court concluded that the practice of polygamy could be punished even when the practice

was motivated by religious belief. *Id.* at 166–67. The Court observed that allowing individuals to excuse such conduct, which it compared to human sacrifice or self-immolation, because of religious motivation would effectively "permit every citizen to become a law unto himself." *Id.*

¶ 161 The essential feature of the *Reynolds* Court's analysis was its conclusion that the practice of polygamy fell within the category of conduct "in violation of social duties or subversive of good order." *Id.* at 164. In the *Reynolds* Court's view, polygamy was an "odious" practice that threatened to infect the surrounding society with notions of patriarchal despotism, undermining the democratic principles on which our governmental structure was founded. *Id.* at 164, 166. Clearly, the purpose of criminalizing polygamy, according to *Reynolds*, was to protect society and the state from such harm. Allowing individuals to engage in polygamy for religious reasons would have thus permitted them to inflict the very harm the statute was designed to prevent. The same is true in the two other examples given in *Reynolds:* (1) exempting someone engaged in religiously motivated human sacrifice from a criminal law against murder would allow that person to kill another; and (2) exempting someone wishing to burn herself on her husband's funeral pyre from a criminal law against suicide would allow that person to kill herself. *Id.* at 165–66.

¶ 162 Understood in this way, *Reynolds* is consistent with those early state constitutions that, by their express terms, guaranteed free exercise of religion to the extent such exercise was consistent with public peace and order.[14] Indeed, when discussing its *Reynolds* decision in *Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890), the Court explicitly referred to such state constitutional provisions. *Id.* at 348, 10 S.Ct. 299 Note (noting that several state constitutions "have declared expressly that [religious] freedom shall not be construed to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the State"). Those who have studied these provisions are divided over whether their drafters contemplated a case-by-case examination in the courts of the particular conduct being criminalized, or whether the violation of any law was per se considered a breach of the peace. *Compare* McConnell, *Origins, supra* ¶ 156, at 1462 (construing these clauses to "exempt religiously motivated conduct from [generally applicable] laws up to the point that such conduct breached public peace or safety"), *with* Philip A. Hamburger, *A Constitutional Right of Religious Exemption: An Historical Perspective,* 60 Geo. Wash. L.Rev. 915, 918 (1992) (indicating that the phrase "contra pacem," or breach of the peace, was understood in the eighteenth century to mean any criminal violation of law). Under either view, it seems clear that there is some conduct that a state may refuse to permit, regardless of its motivation.

¶ 163 I agree that the religious freedom provisions in our state constitution were not intended to exempt religious practitioners from criminal punishment for acts that cause injury or harm to society at large or to other

14. *See, e.g.,* Ga. Const. of 1777, art. LVI (guaranteeing free exercise of religion "provided it be not repugnant to the peace and safety of the State"); Mass. Const. of 1780, art. II (providing that "no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshiping God in the manner and season most agreeable to the dictates of his own conscience ..., provided he doth not disturb the public peace or obstruct others in their religious worship"); Md. Declaration of Rights of 1776, art. XXXIII (proclaiming that "no person ought by any law to be molested in his person or estate ... for his religious practice; unless, under colour of religion, any man shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others, in their natural, civil, or religious rights"); N.H. Const. of 1784, pt. I, art. V (guaranteeing freedom to worship as long as such worship "doth not disturb the public peace, or disturb others"); N.Y. Const. of 1777, art. XXXVIII (providing that its liberty of conscience protection "shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State"); R.I. Charter of 1663 (providing that all persons may enjoy freedom of religious conscience, "they behaving themselves peaceblie and quietlie, and not useing this libertie to lycentiousnesse and profaneness, nor to the civill injurye or outward disturbeance of others"); S.C. Const. of 1790, art. VIII, § 1 (containing same language as New York Constitution of 1777), *all quoted in* McConnell, *Origins, supra* ¶ 156, at 1456–57 & n. 242.

individuals. Moreover, I recognize that by defining conduct as criminal, our legislature has signaled its judgment that this conduct generally does harm society or individuals to a degree that warrants criminal punishment. *See* 1 Charles E. Torcia, *Wharton's Criminal Law* § 7 (15th ed.1993) (distinguishing crime, which is "a public wrong since it implies injury to the state," from tort, which is a "private wrong since it involves injury to an individual"); Laurence H. Tribe, *American Constitutional Law* § 14–13, at 1270 (2d ed.1988) [hereinafter Tribe, *American Constitutional Law* ] (predicting that, "[b]eyond ... paternalistic laws, ... [free exercise] exemptions from criminal laws will be rare"). In "our role as the state's court of last resort, called upon to identify the boundaries of the constitution, [we must] giv[e] appropriate deference to the policy choices of the citizens' elected representatives." *Judd ex rel. Montgomery v. Drezga*, 2004 UT 91, ¶ 22, 103 P.3d 135.

¶ 164 That this is generally true does not, however, foreclose close scrutiny of the circumstances of a particular case in order to determine whether a prosecution for conduct statutorily defined as criminal is truly directed against the harm the statute was intended to prevent, where the conduct in the particular case is religiously motivated. The "right to the free exercise of religion [is] a concept upon which our country was founded and a protection deeply ingrained in the hearts and minds of American citizens." *Green*, 2004 UT 76, ¶ 70, 99 P.3d 820 (Durrant, J., concurring). This court has recognized that this is particularly true for citizens of our state. *Soc'y of Separationists*, 870 P.2d at 935. I believe our constitution expresses this fundamental interest in protecting religious freedom. Given the fundamental nature of the

constitutional interest involved and the undeniable burden that criminal penalties impose, heightened scrutiny is warranted. *Cf. Gallivan v. Walker*, 2002 UT 89, ¶ 40, 54 P.3d 1069 (recognizing that a "heightened degree of scrutiny" is required in a uniform-operation-of-laws analysis where a fundamental right is implicated).

¶ 165 Moreover, I am cognizant of the fact that the body of criminal law has expanded over time as the state has generally expanded its reach into many areas that before went unregulated. Criminal statutes today punish conduct not only where the targeted conduct is harmful in itself, such as laws criminalizing murder, but also where the targeted conduct is closely tied to other harmful activity. Given this fact, there may be circumstances where religiously motivated conduct will not implicate the same state interests that are legitimately served by prosecuting those whose conduct was without similar motivation, simply because of the nature of the religious practice at issue. For example, the religiously motivated use of drugs defined as controlled substances may in some cases be so far removed from the context within which illegal drug use typically occurs that applying the controlled substances law to the religiously motivated use simply does not serve the government's legitimate interest in criminalizing drug use—which involves not only protecting people from the harmful physical effects of such substances, but also eliminating the harms that accompany the drug trafficking industry.[15] Thus, the few instances in which courts have indicated that a generally applicable criminal law may not apply to a religiously motivated actor have done so on the basis that the religiously motivated conduct at issue did not create a genuine risk of harm.[16] Applying this principle, I conclude that in some rare circumstances an individual

15. *See* Garrett Epps, *What We Talk About When We Talk About Free Exercise*, 30 Ariz. St. L.J. 563, 600 (1998) ("Oregon's categorical prohibition on peyote use ... was not inspired by a finding that peyote, like intentional killing, was evil in and of itself, but instead by the judgment that permitting its ritual use would encourage drug abuse, intoxication, negative health effects, and illegal trafficking in drugs. These legislative determinations are not necessarily absurd or unreasonable; but they are subject to empirical refutation in a way that 'intentional killing is bad' is not.").

16. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, —— U.S. ——, ——, 126 S.Ct. 1211, 1224, 163 L.Ed.2d 1017 (2006) (recognizing in a preliminary injunction analysis of an RFRA statutory claim that the government had failed to show that its interest in protecting public health and safety was served by applying a law criminalizing use of hoasca, a hallucinogenic controlled substance, to those who use the drug in religious ceremonies); *Frank v. State*, 604 P.2d 1068, 1073–74 (Alaska 1979) (exempting the defendant under federal and state religious freedom

must be exempted from the operation of a criminal law where the religiously motivated conduct at issue, while technically within the purview of the criminal prohibition, does not threaten the harm that the law was intended to prevent.

¶ 166 Applying heightened scrutiny, I conclude that imposing criminal penalties on Holm's religiously motivated entry into a religious union with Ruth Stubbs is an unconstitutional burden under our constitution's religious freedom protections. This is so whether typical strict scrutiny is applied,[17] or the standard set forth in *United States v. O'Brien*, 391 U.S. 367, 381–82, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (determining whether

a general law may be applied to expressive conduct consistent with the Free Speech Clause), which some have suggested provides a more suitable framework for free exercise analysis.[18] Under either test, the burden on the religious conduct at issue must be necessary to serve a strong governmental interest unrelated to the suppression of religious freedom. I do not believe that any of the strong state interests normally served by the Utah bigamy law require that the law apply to the religiously motivated conduct at issue here—entering a religious union with more than one woman.[19]

¶ 167 I note at the outset that the State has not suggested that section 76–7–101 fur-

17. Most of our sister states that have previously recognized that exemptions from generally applicable laws may at times be required under their state religious freedom provisions have followed the Supreme Court's pre-*Smith* compelling interest analysis. *See, e.g., Miller*, 549 N.W.2d at 241 (" '[W]hile the terms "compelling state interest" and "least restrictive alternative" are creatures of federal doctrine, concepts embodied therein can provide guidance as we seek to strike a balance under the [state] Constitution between freedom of conscience and the state's public safety interest.' " (second alteration in original) (quoting *State v. Hershberger*, 462 N.W.2d 393, 398 (Minn.1990)); *see also Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal.4th 527, 10 Cal.Rptr.3d 283, 85 P.3d 67, 91 (2004) (holding that the petitioner's claim would not survive the compelling interest test without deciding whether its state constitution required that

guarantees from criminal prosecution for unlawful transportation of a moose outside hunting season because there was no evidence that the taking of the moose for ritual use in funeral potlatches would harm the moose population or cause "general lawlessness" among Alaskan citizens); *State v. Whittingham*, 19 Ariz.App. 27, 504 P.2d 950, 952–53 (1973) (holding that the state could not, consistent with the Free Exercise Clause, prosecute those engaged in the religious use of peyote where such use did not cause "a substantial threat to public safety, order or peace"); *People v. Woody*, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813, 818 (1964) (explaining, when granting a Free Exercise Clause exemption from criminal prosecution to Native Americans' religious use of peyote, that "[t]he record ... does not support the state's chronicle of harmful consequences of the use of peyote"); *State v. Miller*, 202 Wis.2d 56, 549 N.W.2d 235, 242 (1996) (exempting Amish, under the religious freedom guarantee of its state constitution, from forfeiture pursuant to a traffic law requiring a slow-moving vehicle emblem because there was no evidence that Amish horse-drawn buggies without the emblem had caused any collisions).

test "or an as-yet unidentified rule that more precisely reflects the language and history of the California Constitution and our own understanding of its import"); *Rupert v. City of Portland*, 605 A.2d 63, 65–66 & n. 3 (Me.1992) (denying claim under compelling interest test and thus not deciding what the state constitution required); *Hunt v. Hunt*, 162 Vt. 423, 648 A.2d 843, 853 (1994) (holding that its state constitution "protects religious liberty to the same extent [as] the Religious Freedom Restoration Act," which requires application of the compelling interest test).

18. *See* Frederick Mark Gedicks, *The Normalized Free Exercise Clause: Three Abnormalities*, 75 Ind. L.J. 77, 84–93 (2000); Frederick Mark Gedicks, *An Unfirm Foundation: The Regrettable Indefensibility of Religious Exemptions*, 20 U. Ark. Little Rock L.J. 555, 572–73 (1998); Michael W. McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. Chi. L.Rev. 1109, 1138–39 (1990); Kathleen M. Sullivan, *Religion and Liberal Democracy*, 59 U. Chi. L.Rev. 195, 214 (1992); *see also Larson v. Cooper*, 90 P.3d 125, 132 (Alaska 2004) (recognizing that the compelling interest test fails to "explain[ ] exactly what degree of fit is required between the [governmental] interest and the means used to achieve it" and adopting a test that is in effect similar to the *O'Brien* test).

19. Holm does not claim that his religious beliefs require that he enter into religious unions with girls under the age of eighteen. As discussed below, I am troubled by the notion that section 76–7–101, which is not explicitly aimed at conduct affecting minors, can be legitimately defended as a necessary tool to combat such conduct. While the age of Ruth Stubbs may have been a relevant factor in the State's decision to bring charges against Holm, it was not a relevant factor in the determination of whether the elements of the crime of bigamy under section 76–7–101 were satisfied.

thers a governmental interest in preserving democratic society. I agree that no such interest is implicated here. As discussed above, the federal government's nineteenth century criminalization of polygamy in the Utah Territory, as construed by the *Reynolds* Court, was intended to address the harm to democratic society that LDS Church polygamy was thought to embody. *See Soc'y of Separationists*, 870 P.2d at 924 (recognizing that the Morrill Act of 1862 was aimed specifically at the LDS Church's practice of polygamy in Utah); Gordon, *The Mormon Question, supra* n. 9, at 30–115 (describing the nineteenth century development of the idea that the LDS Church's practice of polygamy threatened American democracy). However, I do not presume that our modern criminal bigamy statute, enacted in 1973, addresses the same fears—which have since been discounted by many as grounded more in bias than in fact[20]—that propelled Congress' legislation a century earlier.

¶ 168 Indeed, this court previously set forth, in *Green*, a list of state interests served by the modern statute that omits any reference to such a concern. There, we first explained that the modern statute serves the state's interest in "regulating marriage" and in maintaining the "network of laws" that surrounds the institution of marriage. *Green*, 2004 UT 76, ¶¶ 37–38, 99 P.3d 820. We cited a Tenth Circuit case that described this network of laws as " 'clearly establishing [Utah's] compelling state interest in and commitment to a system of domestic rela-

tions based exclusively upon the practice of monogamy as opposed to plural marriage.' " *Id.* ¶ 38 (quoting *Potter v. Murray City*, 760 F.2d 1065, 1070 (10th Cir.1985)). Here, the State has emphasized its interest in "protecting" monogamous marriage as a social institution. I agree that the state has an important interest in regulating marriage, but only insofar as marriage is understood as a legal status. *See Green*, 2004 UT 76, ¶ 71, 99 P.3d 820 (Durrant, J., concurring) (asserting that "the State has a compelling interest in regulating and preserving the institution of marriage *as that institution has been defined by the State* " (emphasis added)). In my view, the criminal bigamy statute protects marriage, as a legal union, by criminalizing the act of purporting to enter a second legal union. Such an act defrauds the state and perhaps an innocent spouse or purported partner. It also completely disregards the network of laws that regulate entry into, and the dissolution of, the legal status of marriage, and that limit to one the number of partners with which an individual may enjoy this status. The same harm is targeted by criminalizing the act of cohabiting with a partner after purportedly entering a second legal marriage with that partner.[21]

¶ 169 However, I do not believe the state's interest extends to those who enter a religious union with a second person but who do not claim to be legally married. For one thing, the cohabitation of unmarried couples, who live together "as if" they are married in

---

**20.** *See* Gordon, *The Mormon Question, supra* n. 9, at 142 (stating that "prejudice against Mormons and their alternative faith played a role in the [*Reynolds* ] decision"); Tribe, *American Constitutional Law, supra* ¶ 163, § 14–13, at 1271 (stating that the *Reynolds* decision "illustrate[s] how amorphous goals may serve to mask religious persecution"); David R. Down & Jose I. Maldonado, Jr., *How Many Spouses Does the Constitution Allow One to Have?*, 20 Const. Commentary 571, 576 (2003–04) (reviewing Gordon, *The Mormon Question* and (observing that the *Reynolds* opinion "teems with hostility toward Mormonism")); *see also* Maura Strassberg, *The Crime of Polygamy*, 12 Temp. Pol. & Civ. Rts. L.Rev. 353, 406 (2003) (stating that, while the "perceived social danger may have justified the criminalization of polygamy during the nineteenth and early twentieth centuries, ... fundamentalist polygyny does not today pose the same kind of large-scale threat to federal and now

state sovereignty over significant areas of the West"). I note that anti-Catholic bias was also prevalent during this period, and an 1880s bestseller listed "Catholicism" ahead of "Mormonism" as one of the "seven perils facing the nation." *See* John C. Jeffries, Jr. & James E. Ryan, *A Political History of the Establishment Clause*, 100 Mich. L.Rev. 279, 302–03 (2001) (explaining that Catholicism was considered "inimical to democracy" because of its "authoritarian" church structure (internal quotation omitted)).

**21.** I note that the bigamous cohabitation prongs in most state bigamy laws appear to target this particular conduct. *See* 11 Am.Jur.2d *Bigamy* § 2 (1997) (indicating that unlawful "bigamous cohabitation" occurs "[i]n jurisdictions where cohabitation within the state *following a bigamous marriage* is made a crime" (emphasis added)).

the sense that they share a household and a sexually intimate relationship, is commonplace in contemporary society. *See, e.g.,* Utah Governor's Comm'n on Marriage & Utah State Univ. Extension, *Marriage in Utah Study* 35–36 (2003), *available at* http://www.utahmarriage.org (indicating that of the 42% of Utah residents between the ages of 18 and 64 who were unmarried, 30% to 46% were currently cohabiting outside of marriage). Even outside the community of those who practice polygamy for religious reasons, such cohabitation may occur where one person is legally married to someone other than the person with whom he or she is cohabiting. Yet parties to such relationships are not prosecuted under the criminal bigamy statute, the criminal fornication statute, Utah Code Ann. § 76–7–104 (2003), or, as far as I am aware, the criminal adultery statute,[22] *id.* § 76–7–103 (2003), even where their conduct violates these laws. *See, e.g., Berg v. State,* 2004 UT App 337, ¶ 15, 100 P.3d 261 (indicating that consenting adults are not prosecuted under Utah's fornication or sodomy laws).

¶ 170 That the state perceives no need to prosecute nonreligiously motivated cohabitation, whether one of the parties to the cohabitation is married to someone else or not, demonstrates that, in the absence of any claim of legal marriage, neither participation in a religious ceremony nor cohabitation can plausibly be said to threaten marriage as a social or legal institution. The state's concern with regulating marriage, as I understand it, has to do with determining who is entitled to enter that legal status, what benefits are accorded, and what obligations and restrictions are imposed thereby. This has lately emerged as an issue of surprising complexity, with various commentators attempting to define the nexus between a couple's private relationship and the network of laws surrounding marriage as a legally recognized status.[23] Our state's network of laws may indeed presume a particular domestic structure—whether it be that a man will live with only one woman, that a couple living together will enter a legal union, or that each household will contain a single nuclear family. However, any interest the state has in maintaining this network of laws does not logically justify its imposition of criminal penalties on those who deviate from that domestic structure, particularly when they do so for religious reasons. In my view, such criminal penalties are simply unnecessary to further the state's interest in protecting marriage.[24]

¶ 171 The state's abandonment of common law marriage, and the proliferation of governmentally regulated marriage, contributes to my conclusion. As mentioned above, the state conditions entry into the legal status of marriage on the performance of certain steps beyond simply entering a marriage-like personal relationship. At the same time, the legal significance of this status has increased

---

22. When asked at oral argument whether anyone had recently been prosecuted under the criminal adultery statute, the State expressed uncertainty, but suggested that there may have been some "attempts" to prosecute adultery. I have found two federal district cases in which the adultery statute was claimed to be relevant. *See Oliverson v. West Valley City,* 875 F.Supp. 1465, 1469 (D.Utah 1995) (considering the claim of a West Valley City police officer who alleged his supervisor disciplined him based in part on his having engaged in conduct that would violate section 76–7–103); *Roe v. Rampton,* 394 F.Supp. 677, 689 (D.Utah 1975) (Ritter, D.J., dissenting) (suggesting that if the plaintiff wife were forced to comply with the requirement that she disclose an abortion to her husband, he would be able to bring charges against her under section 76–7–103). However, I have been unable to discover any prosecution under this provision. The most recent adultery prosecution to have reached this court appears to have occurred in 1928, under a previous criminal provision. *State v. Lewellyn,* 71 Utah 331, 266 P. 261, 262 (1928); *cf.* Note, *Constitutional Barriers to Civil and Criminal Restrictions on Pre- and Extramarital Sex,* 104 Harv. L.Rev. 1660, 1672 (1991) (indicating that in many states criminal adultery statutes are enforced "selectively," often in the context of divorce proceedings).

23. *See* Maggie Gallagher, *Rites, Rights, and Social Institutions: Why and How Should the Law Support Marriage?,* 18 Notre Dame J.L. Ethics & Pub. Pol'y 225 (2004); Linda C. McClain, *Intimate Affiliation and Democracy: Beyond Marriage?,* 32 Hofstra L.Rev. 379 (2003).

24. As I discuss in detail below, I also believe that the imposition of such criminal penalties, at least where the domestic relationships at issue involve only consenting adults, violates individual due process rights, as recognized by the Supreme Court in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

as federal and state governments have ventured ever further into regulating various aspects of individuals' lives.[25] The inevitable corollary to these two facets of governmental involvement with the institution of marriage is that some will consciously choose to form relationships outside the state-delineated boundaries of that institution. At common law, the choice of entering a marriage-like personal relationship without entering the legal status of marriage was less available because a man and a woman who appeared to be married were simply considered married in the eyes of the law. As discussed above, this is no longer the case. In an important sense, then, there has been a significant social and legal divergence between the choice to enter a personal relationship and the choice to enter the legal status of marriage.

¶ 172 Those who choose to live together without getting married enter a personal relationship that resembles a marriage in its intimacy but claims no legal sanction. They thereby intentionally place themselves outside the framework of rights and obligations that surrounds the marriage institution. While some in society may feel that the institution of marriage is diminished when individuals consciously choose to avoid it, it is generally understood that the state is not entitled to criminally punish its citizens for making such a choice, even if they do so with multiple partners or with partners of the same sex. The only distinction in this case is that when Holm consciously chose to enter into a personal relationship that he knew would not be legally recognized as marriage, he used religious terminology to describe this relationship. The terminology that he used—"marriage" and "husband and wife"—happens to coincide with the terminology used by the state to describe the legal status of married persons. That fact, however, is not sufficient for me to conclude that criminalizing this conduct is essential in order to protect the institution of marriage.

¶ 173 In this regard, the case before us resembles *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

There, the United States Supreme Court held that a state law criminalizing the exhibition of the national flag with any extraneous material attached to it violated the defendant's First Amendment right to symbolically communicate his message through such a practice. *Id.* at 406, 94 S.Ct. 2727. In analyzing the issue under the *O'Brien* test, mentioned above, the Court assumed without deciding that the state had valid interests "in preserving the national flag as an unalloyed symbol of our country" and "prevent[ing] the appropriation of a revered national symbol by an individual ... where there was a risk that association of the symbol with a particular product or viewpoint might be taken erroneously as evidence of governmental endorsement." *Id.* at 412–13, 94 S.Ct. 2727. The Court nevertheless held that this interest did not justify the defendant's conviction because "[t]here was no risk that [the defendant]'s acts would mislead viewers into assuming that the Government endorsed his viewpoint." *Id.* at 414, 94 S.Ct. 2727. In other words, the defendant was free to appropriate a revered national symbol for his own communicative purposes so long as he did not thereby purport to speak for the state. I similarly conclude here that an individual is free to appropriate the terminology of marriage, a revered social and legal institution, for his own religious purposes if he does not thereby purport to have actually acquired the legal status of marriage.

¶ 174 The second state interest served by the bigamy law, as recognized in *Green*, is in preventing "marriage fraud," whereby an already-married individual fraudulently purports to enter a legal marriage with someone else, "or attempts to procure government benefits associated with marital status." 2004 UT 76, ¶¶ 37–39, 99 P.3d 820. This interest focuses on preventing the harm caused to the state, to society, and to defrauded individuals when someone purports to have entered the legal status of marriage, but in fact is not eligible to validly enter that status because of a prior legal union. This

---

**25.** *See, e.g., supra* note 7 (providing statistics). At the same time, regulation of the *content* of family relations may be said to have decreased. The complex evolution of domestic law, and government regulation of family and marriage, is described extensively in Lee E. Teitelbaum, *Family History and Family Law*, 1985 Wis. L.Rev. 1135.

interest is simply not implicated here, where no claim to the legal status of marriage has been made.

¶ 175 In *Green*, the court cited "protecting vulnerable individuals from exploitation and abuse" as the third state interest served by the bigamy statute. 2004 UT 76, ¶ 40, 99 P.3d 820. The court concluded that this was a legitimate state interest to which the criminal bigamy statute was rationally related for purposes of our First Amendment Free Exercise Clause analysis. *Id.* ¶ 41. The court rested this conclusion on the idea that perpetrators of other crimes "not unusually attendant to the practice of polygamy"—such as "incest, sexual assault, statutory rape, and failure to pay child support"—could be prosecuted for bigamy in the absence of sufficient evidence to support a conviction on these other charges. *Id.* ¶ 40. Because the federal First Amendment analysis required only rational basis scrutiny, the court was content to rely on assertions in a student law review piece that polygamy was frequently related to other criminal conduct, together with two local cases, including the case of Green himself. *Id.* ¶ 40 & n. 14. However,

reviewing this assessment in light of the heightened scrutiny I believe is called for here, I cannot conclude that the restriction that the bigamy law places on the religious freedom of all those who, for religious reasons, live with more than one woman is necessary to further the state's interest in this regard. Upon closer review, the student Note is unconvincing.[26] The State has provided no evidence of a causal relationship or even a strong correlation between the practice of polygamy, whether religiously motivated or not, and the offenses of "incest, sexual assault, statutory rape, and failure to pay child support," cited in *Green, id.* ¶ 40.[27] Moreover, even assuming such a correlation did exist, neither the record nor the recent history of prosecutions of alleged polygamists warrants the conclusion that section 76–7–101 is a necessary tool for the state's attacks on such harms.[28] For one thing, I am unaware of a single instance where the state was forced to bring a charge of bigamy in place of other narrower charges, such as incest or unlawful sexual conduct with a minor, because it was unable to gather sufficient evidence to prosecute these other crimes.[29] The State has suggested that its

**26.** The Note asserts that "modern testimonials and government investigations suggest that physical and sexual abuse frequently occur in polygamist communities as a result of the structure of such communities." Richard A. Vazquez, Note, *The Practice of Polygamy: Legitimate Free Exercise of Religion or Legitimate Public Menace? Revising* Reynolds *in Light of Modern Constitutional Jurisprudence,* 5 N.Y.U. J. Legis. & Pub. Pol'y 225, 233 (2001). Yet it reveals no factual basis for this assertion other than (1) the Utah case of *State v. Kingston,* 2002 UT App 103, 46 P.3d 761, which, as I indicate below, did not involve a bigamy prosecution; (2) a New York case, *People v. Ezeonu,* 155 Misc.2d 344, 588 N.Y.S.2d 116 (1992), involving a Nigerian native's assertion that he had legally married a thirteen-year-old girl in Nigeria; and (3) information contained in an A & E television broadcast and various newspaper articles concerning the claim of one Utah woman, who grew up in a polygamous family, that her father ritually sexually abused her and her sisters on their sixteenth birthdays. Vazquez, *supra,* at 240–43. The Note itself predicts that "it is unlikely that a flat-out ban on polygamy would meet the 'least restrictive means' requirement of" a traditional strict scrutiny analysis. *Id.* at 253.

**27.** Other than Vazquez, *supra* n. 26, the only "evidence" offered by the State is a journalist-

written collection of anecdotal accounts, Andrea Moore–Emmet, *God's Brothel* (2004).

**28.** Indeed, one scholar has concluded that "criminalization of polygamy is largely a symbolic tool that seems unlikely to either provide substantial protection to victimized adult and teenage women or to enhance state oversight and regulation of fundamentalist communities." Strassberg *supra* n. 20, at 411 (suggesting that "targeting the economic structures and arrangements that make these insular polygamous communities viable" would likely be more effective).

**29.** The court in *Green* noted that the defendant had been convicted of criminal nonsupport and rape of a child in addition to bigamy. 2004 UT 76, ¶ 40 n. 14, 99 P.3d 820. Similarly here, Holm has been convicted of unlawful sexual conduct with a sixteen- or seventeen-year-old in addition to bigamy. The polygamist defendant in *Kingston* was not charged with bigamy but was convicted of incest and unlawful sexual conduct with a sixteen-or seventeen-year-old. 2002 UT App 103, ¶ 1, 46 P.3d 761. It appears from these three cases that the State may be using its ability to prosecute offenders under section 76–7–101 as a means of imposing additional punishment for an already-charged offense rather than as a proxy prosecution for conduct that is otherwise unchargeable. To the extent this is true, such

initial ability to file bigamy charges allows it to gather the evidence required to prosecute those engaged in more specific crimes. Even if there were support for this claim in the record, I would consider it inappropriate to let stand a criminal law simply because it enables the state to conduct a fishing expedition for evidence of other crimes. Further, the State itself has indicated that it does not prosecute those engaged in religiously motivated polygamy under the criminal bigamy statute unless the person has entered a religious union with a girl under eighteen years old. Such a policy of selective prosecution reinforces my conclusion that a blanket criminal prohibition on religious polygamous unions is not necessary to further the state's interests, and suggests that a more narrowly tailored law would be just as effective.[30]

¶ 176 I do not reach this conclusion lightly. I acknowledge the possibility that other criminal conduct may accompany the act of bigamy. Such conduct may even, as was suggested in *Green,* be correlated with the practice of polygamy in a community that has isolated itself from the outside world, at least partially in fear of criminal prosecution for its religious practice. Indeed, the FLDS community in its current form has been likened to a cult, with allegations focusing on the power wielded by a single leader who exerts a high degree of control over followers, ranging from ownership of their property to the determination of persons with whom they may enter religious unions.[31] In

the latter regard, reports of forcible unions between underage girls and older men within the FLDS community have recently appeared in the media.[32] Yet, the state does not criminalize cult membership, and for good reason. To do so would be to impose a criminal penalty based on status rather than conduct—long considered antithetical to our notion of criminal justice. *See Powell v. Texas,* 392 U.S. 514, 533, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968); *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Moreover, such a criminal law would require that the state make normative judgments distinguishing between communities that are actually "cults" and those that are voluntary associations based on common religious or other ideological beliefs. Our system of government has long eschewed this type of state interference. Rather, despite the difficulties that are always associated with gathering evidence in closed societies, the state is held to the burden of proving that individuals have engaged in conduct that is criminal because it is associated with actual harm. The State of Utah has criminal laws punishing incest, rape, unlawful sexual conduct with a minor, and domestic and child abuse. Any restrictions these laws place on the practice of religious polygamy are almost certainly justified. However, the broad criminalization of the religious practice itself as a means of attacking other criminal behavior is not. *Cf. Church of Lukumi Babalu Aye, Inc. v. City*

prosecutions may well raise double jeopardy concerns. *See Illinois v. Vitale,* 447 U.S. 410, 415, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) (recognizing that the Double Jeopardy Clause "protects against multiple punishments for the same offense" (internal quotation marks omitted)).

30. The recently enacted child bigamy statute, Utah Code Ann. § 76–7–101.5 (2003), limits its criminalization to the conduct of those married individuals who purport to marry or cohabit with persons other than their legal spouse who are under the age of eighteen. As the child bigamy statute was not enacted until after Holm's prosecution, Holm was not charged with child bigamy. I express no opinion on the constitutionality of a conviction under that statute.

31. Media reports suggest that this situation has worsened since Warren Jeffs, the son of Rulon Jeffs, assumed the leadership position in 2002 following his father's death. *Polygamous Church*

*May Pull up Roots,* Associated Press, Mar. 5, 2005, *available at* Rick A. Ross Institute, Polygamist Groups, http://www.rickross.com/groups/polygamy.html [hereinafter Ross Institute site]; *Lawsuits and Governmental Scrutiny Increase Pressure on Polygamist Sect,* Associated Press, Sept. 17, 2004, *available at* Ross Institute site, *supra; Authorities Probe Arizona Polygamist Town,* N.Y. Times, Jan. 23, 2004, available at Ross Institute site, *supra.*

32. *E.g., FLDS Runaways Speak Out on Dr. Phil Show,* S.L. Trib., May 4, 2005, *available at* ReligionNewsBlog.com, http://www.religionnewsblog.com/11129; *Polygamists on Utah–Arizona Border Under Scrutiny,* All Things Considered, May 3, 2005, *available at* http://www.npr.org (search term "polygamy"); *Allegations Abound: Colorado City's Polygamous Community Comes Under Increasing Scrutiny,* Havasu News–Herald, Sept. 25, 2004, *available at* Ross Institute site, *supra* n. 31.

*of Hialeah,* 508 U.S. 520, 538, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("The legitimate governmental interests in protecting the public health and preventing cruelty to animals could be addressed by restrictions stopping far short of a flat prohibition of all Santeria sacrificial practice.").

¶ 177 Although the argument has not been raised, I note that for similar reasons I could not uphold Holm's bigamy conviction on the basis that the religiously motivated conduct at issue is inherently harmful to children who grow up in polygamous homes, and are thereby exposed to the "culture" of polygamy.[33] Our previous rulings and legislative policy support this conclusion. For example, this court has previously held that those engaged in the practice of polygamy are not automatically disqualified from petitioning for adoption of a child. *In re Adoption of W.A.T.,* 808 P.2d 1083, 1085 (Utah 1991) (plurality) ("The fact that our constitution requires the state to prohibit polygamy does not necessarily mean that the state must deny any or all civil rights and privileges to polygamists."). Rather, a trial court must hold an evidentiary hearing to consider on a case-by-case basis whether the best interests of the child would be promoted by an adoption by the prospective parents. *Id.* at 1086.

¶ 178 We have also held that a parent's custody petition could not be denied solely because she practiced polygamy. *Sanderson v. Tryon,* 739 P.2d 623, 626 (Utah 1987). Our holding in *Sanderson* was based on our recognition that the legislature's policy regarding child custody and parental rights termination issues has shifted in the past half-century, and now requires that courts focus on the "best interests of the child" rather than passing judgment on the morality of its parents. *Id.* at 627 (recognizing that the 1955 plurality opinion of this court in *In re Black,* 3 Utah 2d 315, 283 P.2d 887, upholding a ruling terminating the parental rights of polygamist parents, was no longer good law in light of the legislature's deletion in 1965 of moral references from the termi-

nation of parental rights statute, Utah Code Ann. § 78–3a–48 (1986) (current version at Utah Code Ann. § 78–3a–407 (Supp.2005))). Given these developments, and the existence of legal mechanisms for protecting the interests of abused or neglected children apart from criminally prosecuting their parents for bigamy, I do not believe the criminalization of religiously motivated polygamous conduct is necessary to further these interests.

¶ 179 Thus, neither the State nor this court's prior decision in *Green* has identified an important state interest served by the criminal bigamy law that requires its application to those who enter religious unions with no claim of state legitimacy. I would therefore reverse Holm's bigamy conviction on the ground that it violates his religious freedom as guaranteed by the Utah Constitution.

## III. FOURTEENTH AMENDMENT DUE PROCESS CLAIM

¶ 180 Because I conclude that Holm's bigamy conviction violates the Utah Constitution's religious freedom guarantees, my dissenting vote is not based on the majority's analysis of Holm's federal constitutional claims. I do, however, wish to register my disagreement with the majority's treatment of Holm's claim that his conviction violates his Fourteenth Amendment right under the Due Process Clause to individual liberty, as recognized by the United States Supreme Court in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). As the majority acknowledges, the Court in *Lawrence* stated the principle that "absent injury to a person or abuse of an institution the law protects," adults are free to choose the nature of their relationships "in the confines of their homes and their own private lives." *Id.* at 567, 123 S.Ct. 2472. The majority concludes that the private consensual behavior of two individuals who did not claim legal recognition of their relationship somehow constitutes an abuse of the institution of marriage, thus rendering *Lawrence* inapplicable. On that basis,[34] the majority sum-

---

**33.** *See also* Down & Maldonado, Jr., *supra* n. 20, at 607 (asserting that "there are no reliable, reported data suggesting that children of polygamous families are uniquely and significantly dis-

advantaged from an economic or emotional standpoint").

**34.** The majority could have limited its rejection of Holm's liberty claim to the fact that Holm's

marily rejects Holm's due process claim as beyond the scope of *Lawrence's* holding. *Supra* ¶ 56. I disagree with this analysis.

¶ 181 As I have discussed extensively above, I do not believe that the conduct at issue threatens the institution of marriage, and I therefore cannot agree that it constitutes an "abuse" of that institution. The majority fails to offer a persuasive justification for its view to the contrary. It asserts that "the behavior at issue in this case" implicates "the state's ability to regulate marital relationships." *Supra* ¶ 57. According to the majority, this regulation includes the state's ability to impose a legal marriage on an individual against his or her will in order to enforce spousal support obligations or prevent welfare abuse. In regard to spousal support, I am unpersuaded that the potential interests of consenting adults who voluntarily enter legally unrecognized relationships despite the financial risks they might face in the future justify the imposition of criminal penalties on the parties to those relationships. Under the majority's rationale, the state would be justified in imposing criminal penalties on unmarried persons who enter same-sex relationships simply because the state, under the applicable constitutional and statutory provisions, is unable to hold them legally married. In regard to welfare abuse, I find it difficult to understand how those in polygamous relationships that are ineligible to receive legal sanction are committing welfare abuse when they seek benefits available to unmarried persons.

¶ 182 The majority also offers the view that "[t]he state must be able to ... further the proliferation of social unions our society deems beneficial while discouraging those deemed harmful." *Supra* ¶ 61. The Supreme Court in *Lawrence*, however, rejected the very notion that a state can criminalize behavior merely because the majority of its citizens prefers a different form of personal relationship. Striking down Texas's criminal sodomy statute as unconstitutional, the Court in *Lawrence* recognized that the Fourteenth Amendment's individual liberty guarantee

"gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." 539 U.S. at 572, 123 S.Ct. 2472. As described in *Lawrence*, this protection encompasses not merely the consensual act of sex itself but the "autonomy of the person" in making choices "relating to ... family relationships." *Id.* at 574, 123 S.Ct. 2472. The sodomy statute was thus held unconstitutional because it sought "to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." *Id.* at 567, 123 S.Ct. 2472.

¶ 183 I agree with the majority that marriage, when understood as a legal union, qualifies as "an institution the law protects." *See id.* at 568, 123 S.Ct. 2472. However, the Court's statement in *Lawrence* that a state may interfere when such an institution is "abuse[d]," *id.*, together with its holding that the sodomy statute was unconstitutional, leads me to infer that, in the Court's view, sexual acts between consenting adults and the private personal relationships within which these acts occur, do not "abuse" the institution of marriage simply because they take place outside its confines. *See id.* at 585, 123 S.Ct. 2472 (O'Connor, J., concurring in the judgment) (indicating that Texas's criminal sodomy law did not implicate the state's interest in "preserving the traditional institution of marriage" but expressed "mere moral disapproval of an excluded group"). In the wake of *Lawrence*, the Virginia Supreme Court has come to the same conclusion, striking down its state law criminalizing fornication. *Martin v. Ziherl*, 269 Va. 35, 607 S.E.2d 367, 371 (2005). In my opinion, these holdings correctly recognize that individuals in today's society may make varied choices regarding the organization of their family and personal relationships without fearing criminal punishment.

¶ 184 The majority does not adequately explain how the institution of marriage is abused or state support for monogamy threatened simply by an individual's choice to

---

behavior involved a minor. That fact alone, in my view, justifies the conclusion that Holm's bigamy conviction does not violate his right to

individual liberty under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

participate in a religious ritual with more than one person outside the confines of legal marriage. Rather than offering such an explanation, the majority merely proclaims that "the public nature of polygamists' attempts to extralegally redefine the acceptable parameters of a fundamental social institution like marriage is plain." *Supra* ¶ 63. It is far from plain to me.

¶ 185 I am concerned that the majority's reasoning may give the impression that the state is free to criminalize any and all forms of personal relationships that occur outside the legal union of marriage. While under *Lawrence* laws criminalizing isolated acts of sodomy are void, the majority seems to suggest that the relationships within which these acts occur may still receive criminal sanction. Following such logic, nonmarital cohabitation might also be considered to fall outside the scope of federal constitutional protection. Indeed, the act of living alone and unmarried could as easily be viewed as threatening social norms.

¶ 186 In my view, any such conclusions are foreclosed under *Lawrence*. Essentially, the Court's decision in *Lawrence* simply reformulates the longstanding principle that, in order to "secure individual liberty, ... certain kinds of highly personal relationships" must be given "a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *see also Laurence H. Tribe, Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak Its Name*, 117 Harv. L.Rev. 1893, 1922 (2004) ("[T]he claim *Lawrence* accepted ... is that intimate relations may not be micromanaged or overtaken by the state."). Whether referred to as a right of "intimate" or "intrinsic" association, as in *Roberts*, 468 U.S. at 618, 104 S.Ct. 3244, a right to "privacy," as in *Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Eisenstadt v. Baird*,

405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), a right to make "choices concerning family living arrangements," as in *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality), or a right to choose the nature of one's personal relationships, as in *Lawrence*, 539 U.S. at 574, 123 S.Ct. 2472, this individual liberty guarantee essentially draws a line around an individual's home and family and prevents governmental interference with what happens inside, as long as it does not involve injury or coercion or some other form of harm to individuals or to society.[35] As the Court in *Lawrence* recognized:

> [F]or centuries there have been powerful voices to condemn [certain private] conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law.

*Id.* at 571, 123 S.Ct. 2472. The Court determined that when "adults ... with full and mutual consent from each other" enter into particular personal relationships with no threat of injury or coercion, a state may not criminalize the relationships themselves or the consensual intimate conduct that occurs within them. *Id.* at 578, 123 S.Ct. 2472.

¶ 187 In conclusion, I agree with the majority that because Holm's conduct in this case involved a minor, he is unable to prevail on his individual liberty claim under the Due Process Clause. However, I disagree with the majority's implication that the same result would apply where an individual enters a private relationship with another adult.

---

**35.** The majority treats Holm's freedom of intrinsic association claim as, in a sense, distinct from his individual liberty claim under *Lawrence*, while at the same time denying the association claim on the basis that no individual liberty interest had been established. *Supra* ¶ 72. In so doing, the majority fails to reconcile its conclu-

sion that private relationships somehow threaten the institution of marriage, and therefore fall outside the scope of any due process protection, with the Court's recognition in *Roberts* that, to the contrary, private relationships can be protected. *Roberts*, 468 U.S. at 618, 104 S.Ct. 3244.

## CONCLUSION

¶ 188 The majority's analysis of Holm's challenges to his bigamy conviction under Utah Code section 76–7–101 relies to a large extent on its failure to distinguish between an individual's false claim to have entered the legal status of marriage and an individual's private, religiously motivated choice to enter a relationship with another person. Because I disagree with this premise, I am unpersuaded that the conclusions flowing from the majority's understanding are correct. In my view, Holm was not properly subject to prosecution under the "purports to marry" prong of section 76–7–101 because he never claimed to have entered a legally valid marriage. Moreover, I would hold Holm's conviction under the "cohabits" prong of section 76–7–101 invalid under the religious freedom provisions of the Utah Constitution. In addition, I believe the majority has erred in suggesting that the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), does not recognize private relationships between consenting adults as entitled to protection under the Fourteenth Amendment's Due Process Clause. I therefore dissent from the majority's conclusion upholding Holm's bigamy conviction. I join the majority in upholding Holm's conviction for unlawful sexual conduct with a minor under section 76–5–401.2.